FILED

04/26/2024

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 22-0586

DA 22-0586

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2024 MT 86

STEVE BARRETT, ROBERT KNIGHT;
MONTANA FEDERATION OF PUBLIC
EMPLOYEES; DR. LAWRENCE PETTIT;
MONTANA UNIVERSITY SYSTEM FACULTY
ASSOCIATION REPRESENTATIVES;
FACULTY SENATE OF MONTANA STATE
UNIVERSITY, DR. JOY C. HONEA;
DR. ANNJEANETTE BELCOURT; DR. FRANKE
WILMER; MONTANA PUBLIC INTEREST
RESEARCH GROUP; ASSOCIATED STUDENTS
OF MONTANA STATE UNIVERSITY; ASHLEY
PHELAN; JOSEPH KNAPPENBERGER; and
MAE NAN ELLINGSON,

> Plaintiffs, Appellees,
> and Cross-Appellants.

v.

STATE OF MONTANA, GREG GIANFORTE;
and AUSTIN KNUDSEN,

> Defendants, Appellants,
> and Cross-Appellees.

APPEAL FROM:   District Court of the Eighteenth Judicial District,
In and For the County of Gallatin, Cause No. DV-21-581B
Honorable Rienne H. McElyea, Presiding Judge

COUNSEL OF RECORD:

For Appellants:

Austin Knudsen, Montana Attorney General, Michael D. Russell, Assistant
Attorney General, Helena, Montana

Emily Jones, Special Assistant Attorney General, Jones Law Firm, PLLC,
Billings, Montana

For Appellees:

James H. Goetz, Jeffrey J. Tierney, Goetz, Geddes & Bardner, P.C., Bozeman, Montana

Raphael Graybill, Graybill Law Firm, P.C., Great Falls, Montana

For Amici Five Female Athletes:

Justin M. Oliveira, Attorney at Law, Billings, Montana

Cody S. Barnett, Alliance Defending Freedom, Lansdowne, Virginia

Submitted on Briefs: August 16, 2023

Decided: April 26, 2024

Filed:

Clerk

2

Justice Ingrid Gustafson delivered the Opinion of the Court.

¶1 The Plaintiffs in this case—made up of former members of the Montana Board of Regents, the Montana Federation of Public Employees (MFPE), a former commissioner of higher education, Montana University System (MUS) faculty organizations, MUS faculty members, MUS student groups, MUS students, and a delegate to the 1972 Montana Constitutional Convention—brought constitutional challenges to four bills passed by the Montana Legislature during the 2021 legislative session. The Plaintiffs filed suit against the State of Montana, Governor Greg Gianforte, and Attorney General Austin Knudsen (collectively, the State) in the Eighteenth Judicial District Court, Gallatin County, seeking a declaration that HB 349, HB 112, HB 102, and §§ 2 and 21 of SB 319, as well as a conditional appropriation found in HB 2 relating to HB 102, were unconstitutional. During the pendency of the present case, both HB 102 and § 21 (and § 22) of SB 319 were found to be unconstitutional in separate cases brought by other plaintiffs in the First Judicial District Court, Lewis and Clark County. The State did not appeal the determination that § 21 (and § 22) of SB 319 was unconstitutional, but did appeal the First Judicial District Court's ruling on HB 102. That court's ruling declaring HB 102 unconstitutional was upheld by this Court in *Bd. of Regents of Higher Educ. of Mont. v. State*, 2022 MT 128, 409 Mont. 96, 512 P.3d 748. With the present case narrowed to the Plaintiffs' challenges to HB 349, HB 112, and § 2 of SB 319, the parties filed cross-motions for summary judgment. The District Court granted the Plaintiffs' motion for summary judgment, denied the State's cross-motion for summary judgment, declared HB 349, HB 112, and § 2 of SB 319 unconstitutional, and denied the Plaintiffs' request for attorney fees in its

3

September 14, 2022 Order on Cross-Motions for Summary Judgment. Both parties appeal from this order.

¶2 The State raises two issues on appeal, which we restate as follows:

*1. Whether Plaintiffs have standing to challenge the constitutionality of HB 349 (2021), HB 112 (2021), and SB 319 (2021).*

*2. Whether HB 112 infringes on the Board of Regents' authority under Article X, § 9 of the Montana Constitution.*

In addition, the Plaintiffs have cross-appealed the portion of the District Court's decision denying them attorney fees. We restate the Plaintiffs' issue on cross-appeal as follows:

*3. Whether the District Court erred by denying the prevailing plaintiffs their attorney fees under the private attorney general doctrine.*

¶3 Via majority, we affirm the District Court's determinations that the Plaintiffs have standing to bring their claims and that the challenged bills are unconstitutional. With regard to the cross-appeal issue 3 set forth above, we do not reach a majority opinion with Justice Gustafson, joined by Justice McKinnon, disagreeing with the District Court's decision to not award attorney fees; Chief Justice McGrath, joined by Justice Baker, agreeing with the District Court's decision to not award attorney fees, and Justice Shea separately agreeing with the District Court's decision to not award attorney fees. Justices Rice and Sandefur take no position on the issue as they would find Plaintiffs had no standing to bring suit. Given the lack of majority on this issue, the District Court's denial of the Plaintiffs' request for attorney fees under the private attorney general doctrine remains undisturbed.

4

**FACTUAL AND PROCEDURAL BACKGROUND**

¶4     In 1972, following a constitutional convention, Montana adopted and ratified a new Constitution.  Since that time, the Montana Constitution has explicitly provided that the "government and control of the Montana university system is vested in a board of regents of higher education which shall have full power, responsibility, and authority to supervise, coordinate, manage and control the Montana university system and shall supervise and coordinate other public educational institutions assigned by law."  Mont. Const. art. X, § 9(2)(a).  During the 2021 legislative session, the Montana Legislature passed the three bills at issue in this case, each of which directly concerns the activities of students in the Montana university system.

¶5     HB 349, codified at §§ 20-25-518 and -519, MCA, regulates student organizations and the speech of students on campus.  The bill purported to limit the abilities of colleges and universities to discipline students for certain kinds of speech and dictate whether certain student organizations are entitled to university recognition, registration, use of university facilities, use of "channels of communication," and funding.

¶6     HB 112, codified at §§ 20-7-1305, -1306, and -1307, MCA, is styled as the "Save Women's Sports Act" and requires sports teams to be expressly designated as either male, female, or coed, based on the biological sex of the participants, bars "students of the male sex" from participating in women's sports, and allows a cause of action against a school for violating these requirements.  In effect, the functional result of the bill would prohibit transgender women from participating in interscholastic athletics.

5

¶7     SB 319 purported to revise campaign finance laws, regulate the funding of certain student organizations, regulate political activity on campus, and modify judicial recusal procedures.[1] Relevant to the present case, § 2 of SB 319, codified at § 20-25-452, MCA, provided that student organizations functioning as political committees which were "regularly active" may be "funded in the same manner as other student organizations, except that if the organization is funded by an additional optional student fee, the fee must be an opt-in fee," essentially singling out certain types of student organizations for disparate funding treatment.

¶8     On June 3, 2021, the Plaintiffs filed their Complaint in the District Court, alleging each of the bills was unconstitutional because they "arrogate[d] to the Legislature powers that are reserved to the Montana Board of Regents." The Plaintiffs sought a declaratory judgment declaring the bills unconstitutional and unenforceable, injunctive relief, and an award of attorney fees and costs under the Montana private attorney general doctrine. On July 16, 2021, the State moved to dismiss, asserting the Plaintiffs lacked standing to challenge the bills at issue, were improperly seeking an advisory opinion, and failed to state a claim upon which relief could be granted. After the parties briefed the motion to dismiss, the District Court held a hearing on December 15, 2021. At the close of that hearing, the court orally denied the State's motion regarding failure to state a claim, but reserved ruling

---

[1] Sections 21 and 22 of SB 319, purporting to regulate political activity on campus and modify judicial recusal procedures, were found unconstitutional by Judge Menahan in *Forward Mont. v. State*, No. ADV-2021-611 (Mont. First Jud. Dist. filed June 1, 2021). Judge Menahan found §§ 21 and 22 of SB 319 violated both the single-subject rule and the command that a bill not be amended in such a manner so as to change its original purpose of the Montana Constitution and permanently enjoined their enforcement. The State did not appeal from this decision.

6

on the standing issue. On March 4, 2022, the District Court issued its Order Denying State's Motion to Dismiss. In its order, the District Court determined the Plaintiffs had both constitutional and prudential standing to challenge each of the bills at issue in this case. Regarding HB 349, the court noted the Plaintiffs included both individual students and student groups which stood to be injured as HB 349 may have the effect of excusing discriminatory conduct and depriving students of the policies and procedures which define their rights and govern their conduct as students. As to HB 112, the court noted the Plaintiffs included representative groups whose members have suffered or will suffer harm due to HB 112 interfering with administration of university athletic programs and compliance with intercollegiate rules and regulations and faced the "reasonably concrete and foreseeable threatened injury" of exclusion from participation in athletics. Regarding § 2 of SB 319, the court noted Plaintiff Montana Public Interest Research Group (MontPIRG) conducts the type of activities targeted by the bill and the funding of its operations was funded by an opt-out fee, which the bill prohibits. As to all challenged bills, the court found the faculty and student organizations sufficiently alleged an injury relating to their engagement with the Board of Regents and that, if the challenged legislation unconstitutionally interfered with the Board's constitutional independence, the Plaintiffs' role in "engaging with the Board to establish policies" would be disrupted.

¶9 Following the denial of its motion to dismiss, the State filed an Answer to the Plaintiffs' Complaint on March 21, 2022. On May 27, the Plaintiffs filed a motion for summary judgment, asserting the challenged bills violated the Board of Regents' constitutional authority under Mont. Const. art. X, § 9 and that the Plaintiffs should be

7

awarded their attorney fees pursuant to the private attorney general doctrine. The State filed a cross-motion for summary judgment on July 1, again asserting the Plaintiffs lacked standing to bring their claims, and further asserting that, on their merits, none of HB 349, HB 112, or § 2 of SB 319, infringed on the Board of Regents' authority. The State also contended the Plaintiffs were not entitled to attorney fees because the State's defense of the challenged laws was neither frivolous nor in bad faith. After the parties fully briefed the competing motions, the District Court held oral argument on September 7. On September 14, the District Court issued its Order on Cross-Motions for Summary Judgment. In this order, the court reaffirmed its previous decision that the Plaintiffs had standing to bring their claims, determined HB 349, HB 112 (as applied to post-secondary institutions), and § 2 of SB 319 were each unconstitutional for violating the Board of Regents' constitutional authority by "attempt[ing] to directly control internal university affairs and inject legislative policy judgments into MUS administration, contrary to the letter and intent of the Montana Constitution." The District Court permanently enjoined "any application or enforcement of these unconstitutional enactments as against the Board of Regents, the Montana University System and its constituent units, and on any MUS campus or property." Though the Plaintiffs prevailed on each of their claims, the District Court denied their request for attorney fees and costs under the private attorney general doctrine. In its decision, the court, in part, relied on § 25-10-711(1)(b), MCA, a statute which allows a court to award costs and attorney fees against the State when a court finds the State's claim or defense to be "frivolous or pursued in bad faith." The District Court

8

found "the State's defense was not frivolous or in bad faith," and accordingly denied the Plaintiffs' attorney fees request.

¶10 The State appeals the District Court's ruling determining the Plaintiffs had standing to challenge all three bills at issue, as well as the court's merits ruling on the constitutionality of HB 112, while the Plaintiffs cross-appeal the court's ruling denying them attorney fees. Additional facts will be discussed as necessary below.

## STANDARD OF REVIEW

¶11 We review a district court's grant or denial of summary judgment de novo, applying the same criteria as M. R. Civ. P. 56. *Monroe v. Cogswell Agency*, 2010 MT 134, ¶ 11, 356 Mont. 417, 234 P.3d 79. Summary judgment is only appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *Monroe*, ¶ 11.

¶12 A district court's determination of a party's standing is a question of law which we review de novo. *Brown v. Gianforte*, 2021 MT 149, ¶ 7, 404 Mont. 269, 488 P.3d 548 (citing *Cmty. Ass'n for N. Shore Conservation, Inc. v. Flathead Cnty.*, 2019 MT 147, ¶ 18, 396 Mont. 194, 445 P.3d 1195).

¶13 We exercise plenary review over matters of constitutional interpretation. *Nelson v. City of Billings*, 2018 MT 36, ¶ 8, 390 Mont. 290, 412 P.3d 1058. Statutes are presumed to be constitutional, and the party challenging a statute's constitutionality bears the burden of proving it unconstitutional beyond a reasonable doubt. *Bd. of Regents*, ¶ 10.

¶14 We review an order granting or denying attorney fees under the private attorney general doctrine for an abuse of discretion. *Burns v. Cnty. of Musselshell*, 2019 MT 291,

9

¶ 10, 398 Mont. 140, 454 P.3d 685.  A district court's determination of whether legal authority exists for an award of attorney fees is a conclusion of law, which we review for correctness.  *Burns*, ¶ 10 (citing *Clark Fork Coal. v. Tubbs*, 2017 MT 184, ¶ 9, 388 Mont. 205, 399 P.3d 295).

## DISCUSSION

¶15    This matter comes to us following cross-motions for summary judgment and none of the material facts regarding the challenged bills are in dispute.  "On cross-motions for summary judgment, where the district court is not called to resolve factual disputes and only draw conclusions of law, we review the district court's conclusions of law to determine whether they are correct."  *Kilby Butte Colony, Inc. v. State Farm Mut. Auto. Ins. Co.*, 2017 MT 246, ¶ 7, 389 Mont. 48, 403 P.3d 664 (citing *Bud-Kal v. City of Kalispell*, 2009 MT 93, ¶ 15, 350 Mont. 25, 204 P.3d 738).  In deciding the competing cross-motions for summary judgment, the District Court addressed the purely legal questions raised by the Plaintiffs' challenge to, and the State's defense of, the legislation at issue here.  On appeal, we do the same.

¶16    *1. Whether Plaintiffs have standing to challenge the constitutionality of HB 112 (2021), HB 349 (2021), and SB 319 (2021).*

¶17    The State has repeatedly challenged the standing of the Plaintiffs in this case—first by moving to dismiss, again on summary judgment, and once again on appeal.  The basic assertion put forth by the State is that, because the Plaintiffs claim the bills violate the Board of Regents' constitutional authority, the Board of Regents is essentially the only proper party to challenge the bills at issue under the theories presented here.  The Plaintiffs,

meanwhile, contend they are proper parties to bring their claims because they are members of the university community and the challenged legislation is directed at them. They assert the "legislature's intrusion into internal university system affairs is an injury in itself that is personal to Plaintiffs and distinct from the public at large" and that they additionally have individual and associational interests germane to each of the bills at issue.

¶18     As an initial matter, the State takes issue with the District Court's treatment of standing in its Order on Cross-Motions for Summary Judgment. In that order, the District Court "decline[d] to revisit its prior order on standing"—a 12-page order denying the State's motion to dismiss on standing grounds—noting that "nothing has changed since the [c]ourt's prior Order" and that "the legal arguments do not depend on factual development in the case," before briefly reiterating its findings that the Plaintiffs had both prudential and constitutional standing. On appeal, the State notes that a court must evaluate standing at every stage of the litigation.[2] *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561, 112 S. Ct. 2130, 2137 (1992). True enough, though evaluating standing at every stage does not require a court to issue and reissue the same order every time one party claims the other lacks standing. Here, the District Court issued a thorough, 12-page order denying the State's motion to dismiss on standing grounds. In response to the State again challenging the Plaintiffs' standing at the summary judgment stage, the District Court "reiterate[d]" its

---

[2] In Montana, however, an exception to this general rule applies to petitions for judicial review of agency decisions. *Hilands Golf Club v. Ashmore*, 2002 MT 8, ¶ 21, 308 Mont. 111, 39 P.3d 697 ("[S]tanding and mootness claims cannot be raised for the first time on judicial review of an administrative agency decision unless the District Court determines that there was good cause for the party's failure to raise the question before the agency."). This exception is not implicated here.

11

previous finding, noting the facts of the case had not changed, and briefly put forth its reasoning as to why the Plaintiffs had both prudential and constitutional standing. The State argues that the District Court was required to consider evidence at the summary judgment stage and failed to do so. But the District Court concluded that the summary judgment evidence did not alter the legal basis for its ruling. And, in any event, this Court conducts de novo review of a party's standing on appeal, regardless of whether or not the issue of standing has even been raised by the parties (either below or on appeal). *Armstrong v. State*, 1999 MT 261, ¶ 4, 296 Mont. 361, 989 P.2d 364; *In re Parenting of D.A.H.*, 2005 MT 68, ¶ 7, 326 Mont. 296, 109 P.3d 247; *Bullock v. Fox*, 2019 MT 50, ¶ 32, 395 Mont. 35, 435 P.3d 1187; *see also Bryan v. Yellowstone Cnty. Elementary Sch. Dist. No. 2*, 2002 MT 264, ¶ 19, 312 Mont. 257, 60 P.3d 381. The State's quibble with the completeness of the District Court's summary judgment order as it relates to standing is immaterial at this point and we need not address it further. We now turn to whether Plaintiffs have standing to challenge the constitutionality of the legislation at issue.

¶19 The State challenged Plaintiffs' standing by first filing an M. R. Civ. P. 12(b)(6) motion to dismiss, and the District Court made its ruling accordingly. In its Order on Cross-Motions for Summary Judgment, the court reaffirmed its previous decision that Plaintiffs had standing to bring their claims challenging the legislation. In considering a motion to dismiss made pursuant to Rule 12(b)(6), a court must consider only the allegations made within the complaint, together with exhibits attached to the complaint. *Goodman Realty, Inc. v. Monson*, 267 Mont. 228, 230-31, 883 P.2d 121, 122-23 (1997). All well-pleaded facts must be taken as true and viewed in the light most favorable to the

12

plaintiff. *Wise v. CNH Am., LLC*, 2006 MT 194, ¶ 6, 333 Mont. 181, 142 P.3d 774. "A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of a claim that would entitle the plaintiff to relief." *Wise*, ¶ 6. When considering a summary judgment motion asserting a party lacks standing, a court must consider the specific facts set forth by the party opposing the motion, "which for purposes of the summary judgment motion will be taken to be true." *Lujan*, 504 U.S. at 561, 112 S. Ct. at 2137. Summary judgment should be rendered when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact" and a party is entitled to judgment as a matter of law. M. R. Civ. P. 56(c)(3). In a multi-plaintiff case such as here, the standing of any one plaintiff is sufficient for a claim to proceed and, upon finding that one plaintiff has standing, "the standing of the other parties [does] not merit further inquiry." *Aspen Trails Ranch, LLC v. Simmons*, 2010 MT 79, ¶ 45, 356 Mont. 41, 230 P.3d 808 (citation omitted).

¶20　The Complaint identifies ex-Regents, the Montana Federation of Public Employees, an ex-Commissioner of Higher Education, faculty organizations, individual faculty members, student groups, and individual students as plaintiffs. We deem the most straightforward application of standing principles concerns the interests of students and faculty who are currently enrolled, teach, and participate in the activities of the MUS. We therefore limit our standing analysis to these plaintiffs and conclude that the standing of the other plaintiffs does not warrant further inquiry.

¶21 The Complaint identifies Plaintiff Montana University System Faculty Association Representatives (MUSFAR) as an umbrella organization that represents and serves the faculty of the MUS, advocating for the interests of that faculty at all of the units in the MUS. The MUSFAR represents faculty members in all matters pertaining to academic affairs and campus administration that broadly affect the MUS and faculty statewide.

¶22 Plaintiff Faculty Senate of Montana State University (Faculty Senate) is the duly-elected governing body of the faculty at MSU. It is composed of representatives from each faculty department, the Library, the Agricultural Research Centers, and the Agricultural Extension Service. The Faculty Senate is the chief governance body of the faculty at MSU Bozeman. It oversees the curricula, evaluates new academic programs, frames procedures and standards of the Faculty Handbook, and serves to enhance communication between the MSU faculty, administration, and students.

¶23 Three individual faculty members are identified in the Complaint: Dr. Joy C. Honea; Dr. Annjeanette Belcourt (Otter Woman), and Dr. Franke Wilmer. Each are current faculty members in the MUS.

¶24 Plaintiff MontPIRG is comprised of an on-campus recognized student group and an independent affiliated non-profit, non-partisan 501(c)(4) with a board comprised entirely of UM students elected by student members. MontPIRG student interns work on a variety of campaigns, including efforts to drive youth participation in the 2020 Census, a relaunch of its Tenant-Landlord Guide, and voter registration drives.

¶25 Plaintiff Associated Students of Montana State University (ASMSU) is the student government of Montana State University. ASMSU is administered by an elected body of

14

students with diverse backgrounds and interests. It serves as the representative voice of students attending Montana State University by engaging with university administration on behalf of the student body regarding matters affecting education, athletics and extracurricular activities, student wellness and safety, and other issues germane to the student population and campus life.

¶26 The Complaint identifies three individual students as plaintiffs: Ashley Phelan, Joseph Knappenberger, and Nicole Bondurant.[3] Each was a currently enrolled student at the time the Complaint was filed.

¶27 The Complaint alleges that the aforesaid Plaintiffs and Plaintiff organizations are concretely and adversely impacted by the challenged legislation. In addition to the interests of their individual members and constituents, the Plaintiff organizations (MUSFAR, MSU Faculty Senate, ASMSU, and MontPIRG) each have an interest in the subject matter of this litigation which is germane to their organizational purpose. Each organization has a strong interest in ensuring academic freedom, safe working conditions, campus safety, freedom of speech, and non-discrimination. The Complaint avers that, in particular, these organizations are apprehensive about the apparent open invitation to harass and discriminate under HB 349 and the negative effect it will have on the learning environment.

---

[3] During the hearing on the summary judgment motions, counsel for the Plaintiffs moved, without objection, to dismiss both Count Two of the Complaint (relating to the HB 2 conditional appropriation) and Nicole Bondurant as a plaintiff. While the District Court orally granted the Plaintiffs' motions to dismiss both Count Two and Bondurant as a plaintiff during the hearing, and the Plaintiffs filed a proposed order reflecting such, it does not appear the District Court issued a written order reflecting the dismissal of Count Two and Bondurant as a plaintiff. We do not consider any claims relating to Count Two or Bondurant on appeal.

These organizations are concerned about the impact on enrollment the legislation will have due to concerns of prospective students and their parents over student safety, academic freedom, discrimination, and limitations on freedom of speech. Plaintiff MontPIRG and other students are further adversely affected by SB 319, which seeks to undercut MontPIRG's organizational funding. Specifically, should MontPIRG participate in ballot activity as it has done in the past, SB 319 would place restrictions on voter registration and other political activities in student dormitories and dining halls. Further, SB 319 would undercut MontPIRG's campus funding by eliminating its "opt-out" feature for student funding. Plaintiffs allege HB 112 provides an exclusion for transgender athletes and that it has constituent members who will suffer harm as a result of HB 112. The Complaint alleges that individual students and faculty members are threatened with the same injury and harm as Plaintiff organizations and that such threatened harms will not be suffered by the population generally.

¶28 After the State's motion to dismiss was denied, the parties conducted discovery regarding the claims in this case. The Plaintiffs' discovery responses, filed by the State as an exhibit to its summary judgment motion, expanded upon the allegations of the Complaint and set forth further facts relating to their standing with regard to the challenged bills.[4] Regarding HB 349, the Plaintiffs note both university campuses and the Board of

---

[4] On appeal, and citing to a 7-page section of one of its own briefs before the District Court, the State glibly asserts that "[t]he statements Plaintiffs rely on to establish standing are inadmissible." Such a citation is wholly inappropriate as the "Montana Rules of Appellate Procedure do not allow for shortcut tactics such as this." *State v. Ferguson*, 2005 MT 343, ¶ 40, 330 Mont. 103, 126 P.3d 463. "The requirement that appellate briefs 'contain' a party's contentions unquestionably precludes parties from incorporating trial briefs or any other kind of argument into appellate briefs

Regents already have extensive non-discrimination policies before setting forth a lengthy explanation of the harm to ASMSU's representational and associational interests, noting ASMSU's commitment to non-discrimination, HB 349's reduction of ASMSU's self-governance and undermining of ASMSU's ability to "uphold anti-discrimination practices outlined in the ASMSU constitution." The Plaintiffs also noted the individual student plaintiffs in the case and a number of protected class student organizations which stood to suffer under HB 349. As to SB 319, the Plaintiffs set forth the harms to MontPIRG—the only organization of its kind—and its loss of funding through its Associated Students of the University of Montana and Board of Regents-approved opt-out fee when registered as a political committee, as well as the imposition of limitations on MontPIRG's speech and activities as it relates to voter registration, signature gathering, and voter turnout efforts on campus under the bill. Relating to HB 112, the Plaintiffs again put forth ASMSU's organizational interest in non-discrimination and upholding diversity and inclusion for the student body, as well as the statement of a plaintiff who has a transgender child, and whose sister also has a transgender child, who could face exclusion from MUS athletics in the future. When considering a summary judgment motion, a court must consider "the pleadings, the discovery and disclosure materials on file, and any affidavits" to determine whether a genuine issue of material fact exists. M. R. Civ. P.

---

by mere reference. Simply put, appellate arguments must be contained within the appellate brief, not within some other document. The mere reference to arguments and authorities presented in district court proceedings is no substitute for developing and presenting appellate arguments." *Ferguson*, ¶ 41.

56(c)(3). With the specific facts adduced from the discovery materials taken as true, *Lujan*, 504 U.S. at 561, 112 S. Ct. at 2137, we consider whether Plaintiffs have standing.

¶29 The determination of a party's standing to maintain an action is a question of law, which we review de novo. *Heffernan v. Missoula City Council*, 2011 MT 91, ¶ 28, 360 Mont. 207, 255 P.3d 80. Standing is one of several justiciability doctrines which limit Montana courts to deciding only "cases" or "controversies." *See Plan Helena, Inc. v. Helena Reg'l Airport Auth. Bd.*, 2010 MT 26, ¶¶ 6-8, 355 Mont. 142, 226 P.3d 567. The question of standing is whether the litigant is entitled to have the court decide the merits of the dispute. *Helena Parents Comm'n v. Lewis and Clark Cnty. Comm'rs*, 277 Mont. 367, 371, 922 P.2d 1140, 1142 (1996).

¶30 There are two strands to standing: the case-or-controversy requirement imposed by the Constitution, and judicially self-imposed prudential limitations. *Heffernan*, ¶ 31. The "'irreducible constitutional minimum of standing' has three elements: injury in fact (a concrete harm that is actual or imminent, not conjectural or hypothetical), causation (a fairly traceable connection between the injury and the conduct complained of, and redressability (a likelihood that the requested relief will address the alleged injury)." *Heffernan*, ¶ 32 (citations omitted). Beyond these minimum constitutional requirements, there are several prudential limits: the plaintiff generally must assert his/her own legal rights and interests; the courts will not adjudicate generalized grievances more appropriately addressed in the representative branches; and the plaintiff's complaint must fall within the zone of interests protected by the law. *Heffernan*, ¶ 32.

18

¶31 The District Court found both that Plaintiffs averred sufficient individualized injuries to confer standing and that Plaintiffs had a legally protected interest through Article X, § 9 of the Montana Constitution which establishes the Board of Regents and the independence of the public higher education system. As we conclude that Plaintiffs established sufficient individualized injuries to confer individual standing, we do not address whether they additionally have standing through an invasion of a legally protected interest conferred by Article X, § 9(2)(a). *Aspen Trails Ranch*, ¶ 45.

### 1. Constitutional Standing.

#### a. HB 349

¶32 HB 349 regulates student organizations and the speech of students on campus. The bill limits the abilities of colleges and universities to discipline students for certain kinds of speech and dictates whether certain student organizations are entitled to university recognition, registration, use of university facilities, funding, and use of "channels of communication." Plaintiffs allege that HB 349 actually promotes and excuses some kinds of student-on-student discrimination by preventing universities from responding to or disciplining discriminatory and harassing speech. Plaintiffs contend protections they previously had through Board of Regents policy have been undercut and discrimination has been encouraged on campuses and in university-affiliated groups and organizations.

¶33 After considering the identity of the Plaintiffs and their role and purpose in higher education, we conclude Plaintiffs have sufficiently alleged and supported a credible injury-in-fact. Plaintiffs allege and support a credible threat of ongoing and future injury due to actual discrimination and lack of recourse. HB 349 may have the effect of excusing

19

discriminatory conduct or of depriving students directly of protections the education system had developed and implemented. Therefore, their injury is not abstract or hypothetical and they have alleged a "personal stake in the outcome of the controversy" sufficient to support the injury prong of constitutional standing. *See Helena Parents Comm'n*, 277 Mont. at 371, 922 P.2d at 1143 (citations omitted). Further, they have met the redressability element of standing – if HB 349 is deemed unconstitutional and enjoined, the alleged harm will necessarily cease, affording complete redress.

b. HB 112

¶34 Plaintiffs characterize HB 112 as a bill "which purports to forbid university athletic teams from allowing transgender athletes to participate in women's sports." The "Save Women's Sports Act," as it has been characterized, requires sports teams to be expressly designated as either male, female, or coed, based on the biological sex of the participants, and bars "students of the male sex" from participating in women's sports and creates a cause of action against a school for violating these requirements.

¶35 The Plaintiffs are representative groups whose constituent members are students who have suffered or will suffer harm as a result of HB 112. ASMSU, in particular, has an associational interest in student athletics, extracurricular activities, student wellness, and student safety. Plaintiffs have sufficiently alleged and supported a stake in the constitutionality of HB 112 and have articulated and supported a credible future and ongoing injury due to actual exclusion from participation. As noted by the District Court, "[t]he forecasted injury, i.e. exclusion of transgender athletes, is not an abstract or remote contingency. It is the expressly stated purpose and function of the challenged legislation."

20

Further, the redressability element of standing is satisfied because if HB 112 is declared unconstitutional and enjoined by this Court, the alleged harm will necessarily cease, affording complete redress.

### c. SB 319

¶36 Plaintiffs challenged portions of SB 319 which they maintain "restrict the ability of student organizations to register students to vote in student dormitories and dining facilities . . . ." SB 319 also prohibits the funding of such organizations through "opt-out" student fee assessments and recognizes a private cause of action with civil fines for groups that violate its restrictions. As the District Court found, MontPIRG conducts the kinds of activities that SB 319 targets. Moreover, its operations have been traditionally funded by an opt-out fee which SB 319 prohibits. MontPIRG has thus established it has a stake in the constitutionality of SB 319 and has credibly alleged and supported that, if developed and implemented, it will suffer an injury-in-fact, which is neither abstract nor hypothetical. Further, the redressability element of standing is satisfied because if SB 319 is declared unconstitutional and enjoined by this Court, the alleged harm will necessarily cease, affording complete redress.

### 2. Prudential Standing.

¶37 With the Plaintiffs' constitutional standing satisfied, we turn to whether they also have prudential standing. "Prudential standing is a form of judicial self-governance that discretionarily limits the exercise of judicial authority consistent with the separation of powers." *Cmty. Ass'n for N. Shore Conservation*, ¶ 19 (citing *Bullock*, ¶ 43). "Prudential standing embodies the notion that courts generally should not adjudicate matters more

21

appropriately in the domain of the legislative or executive branches or the reserved political power of the people." *Bullock*, ¶ 43 (internal quotation marks and citation omitted). Prudential standing is a "malleable" concept, *Schoof v. Nesbit*, 2014 MT 6, ¶ 15, 373 Mont. 226, 316 P.3d 831, and "cannot be defined by hard and fast rules[.]" *Missoula City-County Air Pollution Control Bd. v. Bd. of Env't Rev.*, 282 Mont. 255, 260, 937 P.2d 463, 466 (1997).

¶38    In determining whether a party has prudential standing, "the importance of the question to the public 'surely is an important factor.'" *Missoula City-County Air Pollution Control Bd.*, 282 Mont. at 260, 937 P.2d at 466 (*quoting Comm. for an Effective Judiciary v. State*, 209 Mont. 105, 110, 679 P.2d 1223, 1226 (1984)). The string of bills aimed at the MUS were of great importance to the university community, and, in some cases, to the public of the state at large. Prudential standing considerations are also concerned with "whether the statute at issue would effectively be immunized from review if the plaintiff were denied standing." *Heffernan*, ¶ 33. Here, the Montana Legislature issued a barrage of legislation targeting the MUS in 2021. The Board challenged some of it in the First Judicial District Court, and prevailed. Other third parties challenged some of it in the First Judicial District Court, and prevailed. Prudential considerations simply did not require the District Court to deny standing to these parties and require those other parties, who were already challenging other of the numerous unconstitutional laws aimed at the MUS, to bring suit in their stead. The legislation challenged here directly affected the interests of students, faculty, and staff of the MUS, giving rise to an injury sufficient to confer standing to these Plaintiffs. In *Missoula City-County Air Pollution Control Bd.*, we held that a local

22

board had standing to raise claims "concerning administrative regulation of [an] entity" even when it did not possess regulatory authority over that entity. 282 Mont. at 261, 937 P.2d at 467. We found it "clear . . . that a citizen of Missoula, as one who breathes the air into which Stone Container is expelling pollutants, would have standing to bring this action." *Missoula City-County Air Pollution Control Bd.*, 282 Mont. at 262, 937 P.2d at 467. Justice Rice's dissent appears to misapprehend our decision in this case, as he performs no analysis of the individualized claims set forth by the Plaintiffs in this matter before asserting the Plaintiffs do not have standing in this case because they are not the Board of Regents, but "are free to pursue their own individual claims regarding any unlawful impact HB 349, HB 112, or SB 319 has had upon them." Rice Dissent, ¶ 92. They have pursued such claims. In this very case. And we have determined the individualized injuries suffered by the Plaintiffs are sufficient to confer standing even though the Plaintiffs do not possess the power to act as the Board, just like those citizens who suffered from pollution in *Missoula City-County Air Pollution Control Bd.* Justice Rice would dictate how the Plaintiffs are allowed to present their claims by couching it as an element of standing, asserting the Plaintiffs could bring other claims "for direct violations of rights in their individual capacities, not claims premised upon violation of the Board's constitutional authority," Rice Dissent, ¶ 95, and then, perhaps, he would agree they have standing to challenge the unconstitutional laws. Standing does not require parties to submit their litigation strategy for pre-approval by a judge—it requires them to meet constitutional and prudential standing requirements, which they have. "[T]he question of standing is related [] to whether the dispute sought to be adjudicated will be presented in

23

an adversary context and in a form historically viewed as capable of judicial resolution." *Flast v. Cohen*, 392 U.S. 83, 101, 88 S. Ct. 1942, 1953 (1968). Plaintiffs alleged past, present, or threatened injuries to themselves, distinguishable from injuries to the public generally, on questions of great importance to the public, and which would be alleviated by successfully maintaining the action. Accordingly, both constitutional and prudential standing considerations are met. *Heffernan*, ¶ 33. Having demonstrated standing, the Plaintiffs are allowed to use any proper argument at their disposal in attempting to win on the merits. Here, Plaintiffs used the obvious—and largely conceded by the State— violation of Article X, § 9 to demonstrate HB 112, HB 349, and SB 319's unconstitutionality. The District Court agreed and enjoined the laws at issue, alleviating the injury to the Plaintiffs because those laws no longer had any effect on them. Justice Rice's Dissent attempts to silo the Plaintiffs' claims into his assertion the Plaintiffs sought to act as the Board. They did no such thing—facing concrete injuries to themselves, they merely acted to challenge the legislation when the Board did not for whatever reason. The Constitution determines whether laws are unconstitutional, not the opinions, actions, and inactions of the Board itself. Justice Rice's Dissent further misconstrues our opinion in *Missoula City-County Air Pollution Control Bd.*, distorting it to make it appear to support a conclusion which is logically at odds with its holding. The Plaintiffs' challenge to the legislation here is "a basic question of constitutional and statutory interpretation well-suited to the province of the judiciary" and we have the "clear constitutional authority to interpret the statutory language at issue." *Bullock*, ¶ 46. This is particularly true in a case where, as will be explained below, the State concedes that two of the three challenged bills remaining

24

in this case—HB 349 and § 2 of SB 319—are unconstitutional.[5] To deny standing to the Plaintiffs' claims based on judicially-created prudential limitations in such a case would serve no purpose other than to immunize the State from having its admittedly unconstitutional legislation reviewed.

¶39 Both constitutional standing and prudential standing are satisfied in this case as the Legislature specifically targeted the Montana university community with the legislation at issue. While the Board of Regents would also have standing to challenge the legislation, that does not mean the Board is the only proper party who may challenge the legislation and the university community members here are proper parties and have standing to sue. Accordingly, the District Court correctly determined the Plaintiffs in this case have standing to bring their claims regarding the constitutionality of HB 349, HB 112, and SB 319. We turn now to the merits of the challenged legislation.

¶40 *2. Whether HB 112 infringes on the Board of Regents' authority under Article X, § 9 of the Montana Constitution.*

¶41 As it did below, the State focused much of its briefing on the standing issue. Unlike below, where it defended each of the three bills at issue on their merits, on appeal the State defends on the merits only the constitutionality of HB 112. In its opening brief, the State explicitly noted that, if this Court concludes the Plaintiffs have standing to bring their claims, we should nonetheless "still reverse the district court because HB 112 represents a valid exercise of the Legislature's authority and does not violate the Board's Article X, § 9

---

[5] The State also did not appeal the First Judicial District Court's determination that §§ 21 and 22 of SB 319 were unconstitutional, effectively admitting these sections of SB 319 to be unconstitutional.

25

authority." In response to the State failing to brief any defense of either HB 349 or § 2 of SB 319 on the merits, the Plaintiffs asserted that, by failing to offer any defense of the other challenged bills, the State has "concede[d] most of the legislation it has been defending the last two years is unconstitutional." In reply, the State claimed it did not concede HB 349 and SB 319 were unconstitutional and argued its decision to only provide specific argument on the merits of HB 112 was a "briefing strategy[.]"[6]

¶42    "[B]riefing strategy" or not, the State has in fact conceded HB 349 and SB 319 are unconstitutional by failing to provide any argument that they are in fact constitutional on appeal. *See Clark v. McDermott*, 2022 MT 186, ¶ 14, 410 Mont. 174, 518 P.3d 76.[7] Surely the State had to realize this Court determining the Plaintiffs had standing to bring their claims was a very real possibility, as the District Court twice found standing in this case, and the State included additional briefing on the merits of HB 112, asserting that "[e]ven if the Court finds that this assortment of plaintiffs can vindicate the Board of Regents' constitutional authority, HB 112 survives constitutional muster[.]" By not raising any arguments regarding the merits of HB 349 and SB 319 on appeal, the State has conceded the unconstitutionality of those bills. "[W]e are not obligated to develop arguments on behalf of parties to an appeal, nor are we to guess a party's precise position, or develop

---

[6] In its briefing below, citing to *Bd. of Regents*, ¶ 14, the State argued that the District Court must "evaluate each bill individually to determine whether the Board has exclusive authority over that subject matter."

[7] Without analysis, the State claimed the Plaintiffs' citation to *Clark* in their response brief to be "inaccurate" and *Clark* itself to be "inapplicable." *Clark*'s recognition of our consistent rule that arguments raised below but not appealed are conceded is both accurate and applicable.

legal analysis that may lend support to his position." *McCulley v. Am. Land Title Co.*, 2013 MT 89, ¶ 20, 369 Mont. 433, 300 P.3d 679 (citing *Botz v. Bridger Canyon Plan. & Zoning Comm'n*, 2012 MT 262, ¶ 46, 367 Mont. 47, 289 P.3d 180). This Court is not required to develop the State's merits arguments regarding HB 349 and SB 319, guess at the State's position as to exactly why HB 349 and SB 319 would be constitutional, or to develop legal analysis which may support the State's entirely unstated position on the matter. Baldly asserting this lack of legal analysis was simply a "briefing strategy,"[8] and not a concession of the merits of those bills, is unpersuasive and barred by our case law on the matter. *See Clark*, ¶ 14; *McCulley*, ¶ 20.

¶43 With both HB 349 and § 2 of SB 319 conceded to be unconstitutional infringements of the Board of Regents' constitutional authority, we are left with only the Plaintiffs' challenge to HB 112 to consider. The District Court determined "HB 112 unconstitutionally infringes upon the Board's constitutional authority to oversee student groups and activities and would otherwise invite financial and administrative consequences that firmly place this matter within the Board's exclusive domain" and could not "be fairly characterized as [a] neutral law[] of statewide concern," as HB 112 "attempts to directly control internal university affairs and inject legislative policy judgments into MUS administration, contrary to the letter and intent of the Montana Constitution." Accordingly,

---

[8] We would additionally note that the State's opening brief in this matter was over 2,100 words fewer than the 10,000-word maximum allowed under the Montana Rules of Appellate Procedure. M. R. App. P. 11(4)(a). The Rules also allow for a party to move to file an over-length brief if justified. M. R. App. P. 12(10). It is apparent the State did not choose to not brief the merits of HB 349 and SB 319 due to inadequate word limitations.

the District Court determined HB 112 unconstitutionally violated Article X, § 9 and permanently enjoined its application and enforcement as it pertains to institutions of higher education.[9]

¶44 The State contends HB 112 is not an unconstitutional infringement of the Board's authority because the Board is not the plaintiff in this case, it is possible "that the Board deliberately chose not to challenge HB 112," and appears to contend, for the first time on appeal, that the Board does not have "full and exclusive authority over university athletics," such that the Legislature may micromanage who is allowed to play sports at the state's universities—from varsity teams all the way down to intramural programs. The Plaintiffs contend that the State waived its newfound argument that the Board lacks authority to regulate university athletics and that HB 112 targets and directly interferes with existing Board policy regarding athletics.

¶45 The Plaintiffs are correct to note that this Court generally does "not consider new arguments or legal theories for the first time on appeal[.]" *Pilgeram v. GreenPoint Mortg. Funding, Inc.*, 2013 MT 354, ¶ 20, 373 Mont. 1, 313 P.3d 839 (collecting cases). The State's argument below was not that the Board lacked control over university athletics, but

---

[9] As the District Court did below, we address only whether HB 112 violates the Board of Regents' authority and the bill's application as it pertains to institutes of higher education. HB 112 applies to more than just institutes of higher education, however, applying to "[i]nterscholastic, intercollegiate, intramural, or club athletic teams or sports that are sponsored by a public elementary or high school, a public institution of higher education, or any school or institution whose students or teams compete against a public school or institution of higher education[.]" Section 20-7-1306(1), MCA. We do not reach the question of whether HB 112 violates any other provisions of the Montana Constitution, such as the right to individual dignity and equal protection of the laws, Mont. Const. art. II, § 4, when applied to elementary and high school students and/or athletic teams.

that HB 112 was a neutral, statewide law, not one targeting the Board, and that the Board lacked a policy on transgender athletes. We need not consider the State's new argument regarding the Board's authority to regulate university athletics here, but we do note that "extracurricular activities are part of the educational process[.]" *State ex rel. Bartmess v. Bd. of Trs. of Sch. Dist. No. 1*, 223 Mont. 269, 272-73, 726 P.2d 801, 803 (1986).

¶46 We have recently explained, at some length, the constitutional relationship between the Board of Regents and the Montana Legislature. *Bd. of Regents*, ¶¶ 11-25. We again reiterate "that Montana's Constitution is a prohibition upon legislative power, rather than a grant of power." *Bd. of Regents*, ¶ 11 (citing *Bd. of Regents v. Judge*, 168 Mont. 433, 444, 543 P.2d 1323, 1330 (1975)). In concert with that prohibition, the Board either having, or lacking, a specific policy on a matter germane to the governance of the university system is not a green light for the Legislature to insert itself and attempt to usurp the Board's constitutional authority to "supervise, coordinate, manage and control the Montana university system[.]" Mont. Const. art. X, § 9(2)(a).

¶47 Here, the State argues the Board lacks a specific policy regarding transgender athletes. The Plaintiffs respond that the Board does in fact have a transgender athlete policy, Board of Regents Policy 1202.1. Policy 1202.1(I)(F), promulgated by the Board, provides that "[e]ach campus will comply with National Collegiate Athletic Association or National Association of Intercollegiate Athletics regulation, whichever is applicable in accordance with campus membership, and with the rules established by the athletic conferences to which each campus now belongs or may join." The State asserts this policy

"does not reflect the Board's judgment on transgender athletes or how male and female athletic teams must be designated."

¶48 The Board of Regents has long been responsible for regulating athletics for the MUS, and it has promulgated policies regarding equality, funding, gambling, athletic scholarships, and myriad other topics touching on university athletics. Athletics have long been an area the Board has been constitutionally required to "supervise, coordinate, manage and control[.]" Mont. Const. art. X, § 9(2)(a). Further, it is clear that Policy 1202.1(I)(F) does reflect the Board's judgment on transgender athletes and how male and female athletic teams must be designated, because it requires MUS campuses and teams to comply with either the NCAA or NAIA, as applicable, and to the conferences to which the teams are members. The NCAA and NAIA have transgender athletics policies, which include specific standards for participation, not the blanket ban the Legislature sought to impose on the MUS. *See Transgender Student-Athlete Participation Policy*, National Collegiate Athletic Association, https://perma.cc/EAS3-7XBX; *2023-2024 Official & Policy Handbook*, National Association of Intercollegiate Athletics, https://perma.cc/FR85-AJZR. The Board's authority to regulate university athletics certainly includes the authority to ensure MUS sports teams are in compliance with national and conference regulations and it does not require the Board to go back to the drawing board and impose a new policy every time the NCAA and/or NAIA updates its transgender athlete participation rules.[10] The Board is not delegating its authority to the NCAA and/or

---

[10] The State has asserted that "only the Board of Regents itself can say whether it believes it is out of compliance with the NCAA and NAIA." That would certainly be contrary to requirements for

NAIA, but exercising its authority to promulgate policies which ensure MUS students remain eligible to compete. "[W]here legislative action infringes upon the constitutionally granted powers of the Board to supervise, coordinate, manage, and control the MUS, the legislative power must yield." *Bd. of Regents*, ¶ 24.

¶49 Though HB 112 targets more than just university athletics, by also applying to elementary and high school sports, it does indeed target university athletics, and therefore the Board's constitutional authority. The Legislature cannot avoid Article X, § 9's grant of power to the Board by simply adding non-MUS institutions to the law. We do not ignore the "public interest in challenging the legality of legislative action that allegedly flies in the face of our state constitution." *Comm. for an Effective Judiciary*, 209 Mont. at 111, 679 P.2d at 1226. As applied to the Board, then, HB 112 functions as a "legislative directive of MUS policy and undermines the management and control exercised by the Board to set its own policies and determine its own priorities. The Board, not the Legislature, is constitutionally vested with full authority to determine the priorities of the MUS," including university athletics. *Bd. of Regents*, ¶ 23. Just as in *Bd. of Regents*, our holding here does not "elevate the Board and MUS to a fourth branch of government or provide the Board veto power over state laws it disagrees with." *Bd. of Regents*, ¶ 24. It is simply a rejection of the Legislature's unconstitutional attempt to invade university affairs constitutionally delegated to the Board.

---

participation in the NCAA or NAIA which vests each organization with the right to regulate the compliance of its member institutions and impose penalties ranging from vacating wins to reducing scholarships to imposing the "death penalty"—prohibiting a violating school from sponsoring a sport for up to two years.

¶50 In its summary judgment order, the District Court declared HB 349, HB 112 (as applied to the Board of Regents), and § 2 of SB 319 unconstitutional. By failing to brief any merits defense of HB 349 or § 2 of SB 319 on appeal, the State has conceded those bills are unconstitutional. And we agree with the District Court's conclusion that, as applied to the Board of Regents, HB 112 is unconstitutional. As such, the District Court correctly determined HB 349, HB 112 (as applied to the Board of Regents), and § 2 of SB 319 were unconstitutional and permanently enjoined their enforcement. The District Court's summary judgment order is affirmed as it relates to both the Plaintiffs' standing and the unconstitutionality of the bills at issue.

## CONCLUSION

¶51 The District Court correctly determined the Plaintiffs had standing to bring facial constitutional challenges to HB 112 (2021), HB 349 (2021), and § 2 of SB 319 (2021). The District Court was also correct when it determined each of those bills was unconstitutional.


/S/ INGRID GUSTAFSON


We concur:

/S/ MIKE McGRATH
/S/ LAURIE McKINNON
/S/ JAMES JEREMIAH SHEA


Justice Gustafson, joined by Justice McKinnon, disagreeing with the District Court Judgment as to attorney fees:

32

¶52    *3.   Whether the District Court erred by denying the prevailing plaintiffs their attorney fees under the private attorney general doctrine.*

¶53    While the District Court agreed with the Plaintiffs and granted summary judgment on each of their claims, it nonetheless denied them their attorney fees under the private attorney general doctrine (private AG doctrine).  The Plaintiffs assert the District Court's denial was based on a mistake of law, specifically the court importing the frivolousness and/or bad faith statutory requirements of § 25-10-711, MCA, to the common law private attorney general doctrine.  The Plaintiffs further assert this Court should overturn our 2012 decision in *W. Tradition P'ship v. Att'y Gen. of Mont.*, 2012 MT 271, 367 Mont. 112, 291 P.3d 545, "insofar as it holds that 'bad faith' and 'frivoulous[ness]' are relevant considerations" under the private AG doctrine.  The State asserts the District Court properly denied fees based on equitable factors and public policy considerations and contends its defense of the bills at issue was not done in bad faith.

¶54    "Montana follows the American Rule regarding payment of attorney fees—that each party is generally responsible for its own."  *Davis v. Jefferson Cnty. Election Off.*, 2018 MT 32, ¶ 10, 390 Mont. 280, 412 P.3d 1048 (citing *W. Tradition P'ship*, ¶ 9).  In that vein, a prevailing party is generally not entitled to recover its attorney fees, but there are equitable exceptions to the general rule.  *Davis*, ¶ 10 (citations omitted).  One such equitable exception is the private attorney general doctrine.  *W. Tradition P'ship*, ¶ 13.  "The purpose of the Doctrine is to 'provide[] an incentive for parties to bring public interest related litigation that might otherwise be too costly to bring.'"  *Forward Mont. v. State*, 2024 MT 75, ¶ 24, ___ Mont. ___, ___ P.3d ___ (quoting *Sunburst Sch. Dist. No. 2 v.*

33

*Texaco, Inc.*, 2007 MT 183, ¶ 91, 338 Mont. 259, 165 P.3d 1079). "This doctrine 'is normally utilized when the government, for some reason, fails to properly enforce interests which are significant to its citizens.'" *W. Tradition P'ship*, ¶ 13 (quoting *Montanans for the Responsible Use of the Sch. Tr. v. State ex rel. Bd. of Land Comm'rs*, 1999 MT 263, ¶ 64, 296 Mont. 402, 989 P.2d 800 (*Montrust*)).

¶55 To determine whether an award of fees under the private AG doctrine is warranted, "a court must consider the following factors [first adopted by this Court in *Montrust*, ¶¶ 66-67]: (1) the strength or societal importance of the public policy vindicated by the litigation, (2) the necessity for private enforcement and the magnitude of the resultant burden on the plaintiff, (3) the number of people standing to benefit from the decision." *Burns*, ¶ 13 (internal quotation marks and citation omitted). "The court must also consider whether awarding fees would be unjust under the circumstances." *Burns*, ¶ 13 (citing *Bitterroot River Protective Ass'n v. Bitterroot Conservation Dist.*, 2011 MT 51, ¶ 20, 359 Mont. 393, 251 P.3d 131 (*BRPA III*)). An award of fees under the private AG doctrine is available "only in litigation vindicating constitutional interests." *Am. Cancer Soc'y v. State*, 2004 MT 376, ¶ 21, 325 Mont. 70, 103 P.3d 1085 (citing *Montrust*, ¶ 66).

¶56 In rejecting the Plaintiffs' private AG doctrine attorney fee claim, the District Court addressed each of the three *Montrust* factors, before noting it also looked to § 25-10-711, MCA, to determine whether the Plaintiffs should be awarded fees under the private AG doctrine. Section 25-10-711, MCA, is a specific statute allowing an award of costs against a governmental entity when a suit or defense is found to be frivolous or pursued in bad faith:

34

In any civil action brought by or against the state, a political subdivision, or an agency of the state or a political subdivision, the opposing party, whether plaintiff or defendant, is entitled to the costs enumerated in 25-10-201 and reasonable attorney fees as determined by the court if:

(a) the opposing party prevails against the state, political subdivision, or agency; and

(b) the court finds that the claim or defense of the state, political subdivision, or agency that brought or defended the action was frivolous or pursued in bad faith.

Section 25-70-711(1), MCA. In *W. Tradition P'ship*, we found this statute was "not dispositive," but "serves as a guidepost in analyzing a claim for fees under the private attorney general doctrine." *W. Tradition P'ship*, ¶ 18. We further noted that, in *Montrust*, "we implied that since the private attorney general doctrine is an *equitable* exception to the American Rule, the statute was not controlling." *W. Tradition P'ship*, ¶ 18 (citing *Montrust*, ¶ 64) (emphasis in original). We then went on to distinguish *Montrust* as "not a 'garden variety' constitutional challenge to a legislative enactment" because it involved unique issues regarding the State's breach of fiduciary duties imposed under the Montana Constitution. *W. Tradition P'ship*, ¶ 19. In denying fees under the private AG doctrine in *W. Tradition P'Ship*, we noted the State mounted a good faith defense to a law prohibiting corporations from contributing to candidates which "was grounded in constitutional principles and in an effort to enforce interests the executive deemed *equally significant* to its citizens. The Attorney General defended a statute with deep roots in the State's history, enacted by initiative of the people to combat corruption that had resulted in the bribery of state judges and the embarrassment of seeing one of the State's U.S. Senators unseated for

also accepting bribes" and therefore the predicate for an award of fees under the private AG doctrine was not met. *W. Tradition P'ship*, ¶ 20 (emphasis added).

¶57 The Plaintiffs ask us to overrule *W. Tradition P'ship* and its discussion of § 25-10-711, MCA, as a guidepost which may be used by a court when analyzing a claim for fees under the private AG doctrine. We do not, at this juncture, find it necessary to overrule *W. Tradition P'ship*, but take the opportunity to spotlight its ultimate holding, found two paragraphs beyond where the District Court cited, and which is unchanged from the private AG doctrine analysis set forth in *Montrust*: "the predicate for an award of fees under the private attorney general doctrine" remains "when the government, for some reason, fails to properly enforce interests which are significant to its citizens[.]" *W. Tradition P'ship*, ¶ 20. So, while a court may *consider* frivolousness or bad faith in analyzing a potential private AG doctrine award, the three *Montrust* factors, and the ultimate determination of whether the government, for some reason,[11] failed to properly enforce interests which are significant to its citizens, remain dispositive to the question of whether an award of fees under the private AG doctrine is available.[12]

---

[11] Which could include, among other things, where the governmental agency with authority to challenge the constitutionality of particular legislation has been threatened, by provision in the legislation or otherwise, with loss of funding should it challenge the legislation.

[12] As stated by the Supreme Court of California in the case we adopted both the Private AG Doctrine and its resulting three-part inquiry from, "[t]he 'private attorney general' theory *must be accepted or rejected on its own merits* -- i.e., as a theory rewarding the effectuation of significant policy -- rather than as a policy-oriented extension of the 'substantial benefit' theory burdened with the limitations of that rationale." *Serrano v. Priest*, 569 P.2d 1303, 1314 n.16 (Cal. 1977) (emphasis added).

36

¶58 With these considerations in mind, we address whether the Plaintiffs should be entitled to an award of fees under the private AG doctrine in this case. The State provides no analysis of each *Montrust* factor in response to the Plaintiffs' cross-appeal, asserting that "[e]ven if Plaintiffs can plausibly satisfy each factor, equitable factors must also favor an award" and contending the equitable considerations weigh in favor of the State. The Plaintiffs contend they meet each of the *Montrust* factors and are entitled to private AG doctrine fees. The District Court held the Plaintiffs met two of the three *Montrust* factors below, but determined the Plaintiffs did not meet the "necessity of private enforcement" prong of the test and then also determined the State's defense was not made in bad faith.

¶59 Regarding the first *Montrust* factor, "the strength or societal importance of the public policy vindicated by the litigation," *Burns*, ¶ 13, the District Court found this factor was met. "It is the vindication of constitutional interests that demonstrates the societal importance of the litigation." *Burns*, ¶ 21. In seeking to vindicate the Montana Constitution's explicit grant of authority to the Board of Regents to govern the MUS, the Plaintiffs have "litigated important public policies that are grounded in Montana's Constitution." *Montrust*, ¶ 67. The constitutional issues regarding the Board's authority raised in this case "implicate the heart of the constitutional purpose of" Article X, § 9. *Burns*, ¶ 20. It is abundantly clear the Plaintiffs meet the first private AG doctrine factor.

¶60 Even when important constitutional interests are vindicated by the litigation, we still look at the second *Montrust* factor—"the necessity for private enforcement and the magnitude of the resultant burden on the plaintiff." *Burns*, ¶ 13. Under this factor, we consider whether invoking the private AG doctrine provides an incentive to the parties to

37

bring public interest litigation that would otherwise be too costly to bring. *Forward Mont.*, ¶ 36; *Sunburst*, ¶ 91. When litigants are motivated primarily by their own interest and only coincidentally protect the public interest, attorney fees are inappropriate. *Forward Mont.*, ¶ 36; *Sunburst*, ¶ 91.

¶61    In considering the second *Montrust* factor, the District Court found this factor to weigh in favor of the State because the "Board of Regents could have initiated an action asserting its constitutional authority and challenging the bills at issue in this case, thereby alleviating Plaintiffs' burden in this matter." At the outset of our consideration, we note that protection of the public interest and vindication of citizens' constitutional rights are at the heart of, not coincidental to, the litigation. We also find it salient that, once again, the State provided no analysis on this factor. "'This Court will not consider unsupported arguments, locate authorities or formulate arguments for a party in support of positions taken on appeal.'" *Forward Mont.*, ¶ 38 n.6 (quoting *State v. Kearney*, 2005 MT 171, ¶ 16, 327 Mont. 485, 115 P.3d 214). The District Court found this uncertainty weighed in favor of the State because the "Board of Regents could have initiated an action asserting its constitutional authority and challenging the bills at issue in this case, thereby alleviating Plaintiffs' burden in this matter." We disagree that merely because the Board could have initiated an action, this factor weighs in favor of the State.[13] The District Court's decision

---

[13] The Plaintiffs in this case noted their case had been in preparation for "a number of weeks," but they delayed filing, "hoping that the Board of Regents would, itself, seek to vindicate its constitutional authority." It was only after the Board voted to challenge only HB 102 on May 19, 2021, and then filed for original jurisdiction in this Court that the Plaintiffs followed suit by also seeking original jurisdiction, but seeking to challenge HB 112, HB 349, and SB 319 in addition to HB 102. In their petition, the Plaintiffs noted they delayed filing waiting for the Board, and then

came after the Plaintiffs repeatedly litigated their standing to bring the claims in the face of the State's opposition and the court repeatedly found they had standing to bring their claims. Foreclosing a private AG doctrine award on a hypothetical—that the Board could file its own action—when the court's decisions alleviated any potential need for the Board to file its own action creates an untenable Catch-22. Private parties cannot be forced to wait indefinitely for a governmental entity to bring a suit which may or may not ever come when faced with unconstitutional legislation. The District Court's determination that the Board could have initiated an action also fails to consider that the Board took no action over the nearly 1½ year period from the filing of the complaint to the District Court's granting Plaintiffs summary judgment—the Board did not seek to be added or substituted as the party in interest and it did not seek to intervene or otherwise indicate an intention to bring an action challenging HB 349, HB 112, or SB 319.[14] The Board's failure to initially challenge the subject legislation for whatever reason and its intervening prolonged inaction

only filed after the Board did. They further noted they "may move to consolidate their Petition with that of the Regents[.]" After this Court quickly dismissed both petitions for original jurisdiction on May 26, 2021, *see Bd. of Regents v. State*, No. OP 21-0246, Order (Mont. May 26, 2021) and *Barrett v. State*, No. OP 21-0247, Order (Mont. May 26, 2021), the Board filed suit in district court on May 27, 2021, again challenging only HB 102. It was only after the Board filed its suit in district court, challenging only HB 102, that these Plaintiffs filed their Complaint in the District Court. Rather than demonstrating the Board did not act, the record demonstrates that the Board did act—repeatedly—and "for whatever reason," only challenged HB 102.

[14] It is also noted that on appeal, the Board did not seek to file an amicus brief or otherwise participate in the appeal.

overwhelmingly demonstrate the necessity for private enforcement.[15]  And, again, the State did not provide any specific argument regarding this factor.

> Since the only governmental entity involved in this case was defending the statute, private enforcement was necessary.  "Although there are within the executive branch of the government offices and institutions (exemplified by the Attorney General) whose function it is to represent the general public in such matters and to ensure proper enforcement, for various reasons the burden of enforcement is not always adequately carried by those offices and institutions, rendering some sort of private action imperative."  *Serrano*, 569 P.2d at 1313.  The second factor of *Montrust* is met.

*Forward Mont.*, ¶ 41 (quoting *Serrano*, 569 P.2d at 1313).  Both the necessity and the magnitude of the Plaintiffs' burden—litigating this case against the State and its nearly unlimited legal resources for over 34 months as of the date of this Opinion while asserting no monetary damage claims—clearly weigh in favor of the Plaintiffs.  *See Montrust*, ¶ 67.

¶62     While the Chief Justice agrees the first and third *Montrust* factors weigh in favor of fees, his agreement with the District Court judgment as to fees (McGrath Concurrence) notes his concern with the second *Montrust* factor—the necessity of private enforcement— being met in this case, McGrath Concurrence, ¶ 78 n.4, and notes the Plaintiffs here filed suit "a month before HB 112 and SB [319] were set to go into effect."  McGrath Concurrence, ¶ 80.  This is then negatively compared with the Board's challenge to HB 102, which was "just four days before a main provision of the Bill was set to go into effect." McGrath Concurrence, ¶ 80 n.5.  Conspicuously absent from this entire discussion is HB

---

[15] Under the District Court's reasoning, unless the government is precluded from bringing the constitutional challenge, the second *Montrust* factor is, in essence, defeated.  Contrary to *Montrust*, this would effectively eliminate use of the private AG doctrine when the government, for some reason, fails to properly enforce interests which are significant to its citizens.

349, which went into effect on April 15, 2021, *over a month before* the Board filed either of its two suits challenging only HB 102. 2021 Mont. Laws ch. 234, § 1. At the time the Board filed its suits challenging only HB 102, HB 349 was *already* infringing on the Board's constitutionally guaranteed independence and yet the Board did not file suit to challenge it. And HB 349 was also *currently* affecting the tens of thousands of Montana University System students subject to the bill, which this Court found constituted "a credible threat of ongoing and future injury due to actual discrimination and lack of recourse," because the bill "may have the effect of excusing discriminatory conduct or of depriving students directly of protections the education system had developed and implemented." Opinion, ¶ 33. The Board, though capable of asserting its own constitutional independence as evidenced by its challenge to only HB 102, simply chose not to "for whatever reason." The actual student Plaintiffs here, who were threatened with actual discrimination, cannot be forced to wait indefinitely for the Board to assert its own independence. The second *Montrust* factor, in addition to being conceded by the State who chose not to brief any dispute of this factor, is also clearly met by the facts of the case. "[A]lthough we have not set a threshold number of people benefitting from the decision to support attorney fees under the Doctrine, clearly issues of statewide importance are sufficient to pass muster under the third factor." *Forward Mont.*, ¶ 42. Tens of thousands of MUS students were facing the prospect of actual harm and discrimination, the Board did not act, and the student Plaintiffs here—after waiting "a number of weeks" for the Board to assert its own constitutional independence—stepped up and challenged unconstitutional legislation in the face of governmental indifference by the Board. If waiting over a month

41

beyond the time HB 349 came into effect, with no challenge by the Board, is not long enough to demonstrate the necessity of private enforcement, what would be? Six months? Must they face a full year of "actual discrimination" with a "lack of recourse" before it is evident the Board, "for whatever reason," is not challenging the law? Again, these parties, who were facing actual harm, cannot be forced to wait indefinitely for a Board challenge which may never come.

¶63 The District Court found the third *Montrust* factor, "the number of people standing to benefit from the decision," *Burns*, ¶ 13, was satisfied in this case. We agree. Once again, the State did not brief any dispute of this factor. As noted by the District Court, "Montana's public universities are among the largest and most important public institutions in this state. This case stands to benefit the more than 40,000 students who presently make up the Montana University System as well as future students and many thousands of MUS faculty, employees, and the public at large." The Plaintiffs choosing to bring this case against the State has benefitted, and will benefit, the people of this state, who all benefit when constitutional interests are vindicated.

¶64 With each of the *Montrust* factors satisfied—and not seriously contested by the State—in this case, we address the District Court's reliance on § 25-10-711, MCA, in denying private AG doctrine fees. The District Court found the State's defense "was not frivolous or pursued in bad faith[.]" Once again, frivolousness and bad faith are simply guideposts along a path to determine whether the ultimate "predicate for an award of fees under the private attorney general doctrine," which is "when the government, for some reason, fails to properly enforce interests which are significant to its citizens," has been

42

met. *W. Tradition P'ship*, ¶ 20. Relying solely on a statutory-based determination that frivolousness and bad faith have not been demonstrated is not proper exercise of discretion under the private AG doctrine. "The private attorney general doctrine, however, is an equitable exception to [the American] rule, 'when the government, for some reason, fails to properly enforce interests which are significant to its citizens' and private citizens must take up litigation to vindicate those interests." *Burns*, ¶ 13 (quoting *Montrust*, ¶ 64). Here, the Plaintiffs had to take up litigation to vindicate the interests of the university community and the Board of Regents' independence and constitutional authority. Under the private AG doctrine, "it may be considered equitable to award attorneys' fees" to the Plaintiffs in such a circumstance. *Finke v. State ex rel. McGrath*, 2003 MT 48, ¶ 33, 314 Mont. 314, 65 P.3d 576.

¶65 In addition, while we need not make a judicial determination of bad faith in this case, there are indications where one could question whether the State was not entirely acting in good faith by defending all of the bills at issue here. One such indication is that the State *did not even brief* any merits defense for two of the three challenged bills on appeal after the District Court declared them unconstitutional. Yet the State, in its zeal to impose unconstitutional legislative enactments against the Board and the MUS, continued to assert the Plaintiffs could not even bring the claim against those laws the state concedes are unconstitutional. The State also failed to contest any of the *Montrust* factors of the private AG doctrine, essentially conceding the Plaintiffs were forced to bring their claims to vindicate constitutional guarantees in the face of State opposition.

43

¶66    Failing to contest any of the *Montrust* factors, the State hangs its hat on equitable considerations and its belief the State cannot have fees awarded against it under the private AG doctrine for unconstitutional legislation.  Citing to *Finke*, the State argues it is legislatively immune from private AG doctrine fees outside of exceptional circumstances. *Finke*, ¶ 34 (citing § 2-9-111, MCA).  As noted in *Forward Mont.*, "a reading of the statute (§ 2-9-111, MCA) mentioned in *Finke* does not lead to a conclusion that it prohibits attorney fees against the State." *Forward Mont.*, ¶ 22.  Section 2-9-111(2), MCA, provides a "governmental entity is immune from suit for a legislative act or omission by its legislative body, or any member or staff of the legislative body, engaged in legislative acts."    In *Finke*, we declined private AG doctrine fees to voters who successfully challenged a building code law after determining it would be unjust "to force the Counties [where the plaintiffs resided] to pay for the unconstitutional actions of the Legislature" and it would be inequitable to impose private AG doctrine fees against the counties "who neither fashioned nor passed the unconstitutional law[.]" *Finke*, ¶ 33.  In dicta, we also declined to award the *Finke* plaintiffs fees against the State, though they "did not specifically seek attorneys' fees from the State," citing to the legislative immunity shield of § 2-9-111, MCA.  *Finke*, ¶ 34.  *Finke* can be read two ways: (1) fees are unavailable when a plaintiff does not specifically request them, or (2) it might be understood to draw a line between enaction and enforcement—with attorney's fees available against the State only when it is tasked with enforcing an unconstitutional law.  Either way, *Finke* and its dicta discussion of § 2-9-111, MCA, raised by the Court apparently sua sponte in that case, do not provide a categorical bar on private AG doctrine fees being awarded against the

44

government. Here, unlike in *Finke*, the State alone had the power to enact or to avoid enacting unconstitutional legislation. In addition, the State did not specifically raise § 2-9-111, MCA,[16] as a reason to deny private AG doctrine fees below, instead relying on its assertion it was not acting in bad faith. The private AG doctrine, as an equitable doctrine, must still be understood to be guided by its underlying purpose, to provide some compensation to the individuals who take on the burden to vindicate the public good "when the government, for some reason, fails to properly enforce interests which are significant to its citizens[.]" *W. Tradition P'ship*, ¶ 20.

¶67    *Forward Mont.* and *W. Tradition P'ship* discussed attorney fees in relation to the Attorney General's defense of the law and our hesitancy to interfere with executive functions of the state. In discussing attorney fees in relation to the Attorney General's defense of the law, we looked at whether the Attorney General had defended the law frivolously or in bad faith as a guidepost. *Forward Mont.*, ¶ 25. We then noted that similar guidepost consideration is warranted in determining whether fees are proper under the private AG doctrine when the legislature enacts unconstitutional laws—to look to the conduct of the legislature in enacting unconstitutional laws. *Forward Mont.*, ¶ 30. Here, like in *Forward Mont.*, legislative acts are at issue and we similarly use caution so as not to interfere with proper functioning of the legislative branch.

---

[16] This statute, part of the Montana Tort Claims Act, provides only that the State cannot be held liable under a tort theory for enacting laws. Legislative immunity does not leave citizens without judicial recourse against unconstitutional laws. *See* § 2-9-102, MCA (which allows suits against the government for acts/omissions committed by government employees acting in course and scope of employment).

¶68 Here, the Legislature was put on notice by legislative services that HB 112 and HB 349 likely violated Article X, § 9 of the Montana Constitution and the Board's authority. Despite this, no effort was made to address these concerns and the Legislature willfully disregarded its constitutional duties and purposely passed unconstitutional legislation. The circumstances surrounding the passage of SB 319 is similar to that discussed in *Forward Mont.*, in which the legislature violated the Constitution by adding unrelated amendments which changed both the subject and purpose of SB 319 onto an already-existing bill during a free conference committee. *See generally Forward Mont.*, ¶¶ 24-34. While *Forward Mont.* discussed only the unconstitutionality and impropriety of §§ 21 and 22 of SB 319, § 2, at issue here, was yet another amendment loaded onto SB 319 during that same free conference committee. To award fees to the plaintiffs who successfully challenged §§ 21 and 22 of SB 319, while denying fees to these Plaintiffs who successfully challenged § 2 of the very same bill, passed under the exact same circumstances we found warranted a fee award in *Forward Mont.*, as the Chief Justice's Concurrence would have us do in this case, would single these Plaintiffs—largely college students and student groups—out for disparate treatment simply because they vindicated a different constitutional obligation blatantly disregarded by the Legislature. We would also note that these Plaintiffs did in fact challenge § 21 of SB 319 in their Complaint, but their challenge to that section was mooted after Judge Menahan found § 21 unconstitutional in *Forward Mont.* and the State did not appeal that determination. The parties who successfully challenged § 21 of SB 319 in the other litigation were awarded attorney fees under the private AG doctrine. *Forward Mont.*, ¶ 44. While the Chief Justice claims the "proceedings and policies vindicated do

46

not present the same equitable considerations that were present" in *Forward Mont.*, McGrath Concurrence, ¶ 71 n.1, such an assertion is unmoored from the factual record. Once again, § 2 of SB 319, unrelated to the bill's original subject and purpose, was loaded onto the bill during the free conference committee, in a move by the Legislature which was so clearly unconstitutional we determined it demonstrated the bad faith of the Legislature and necessitated an award of attorney fees to the plaintiffs of *Forward Mont.* Due to those actions, this Court concluded that attorney fees were proper "because of the process through which the unconstitutional sections of this Bill came to be: an obviously unlawful Bill adopted through willful disregard of constitutional obligations." *Forward Mont.*, ¶ 20. The factual record regarding the passage of § 2 of SB 319 is identical to that of §§ 21 and 22 of SB 319—"an obviously unlawful Bill adopted through willful disregard of constitutional obligations." *Forward Mont.*, ¶ 20. It is disingenuous to suggest that these Plaintiffs do not deserve an award of attorney fees for challenging a different section of the same bill we have already determined warranted fees, merely because they demonstrated the bill also violated Mont. Const. art. X, § 9(2)(a). And the Chief Justice's Concurrence correctly notes that the "point of the private AG doctrine is to reward attorneys who bring successful public interest litigation that vindicate[s] constitutional interests." McGrath Concurrence, ¶ 71 n.1. The Plaintiffs in this case have done just that, vindicating Article X, § 9's constitutional guarantee of an independent Board of Regents from three clearly unconstitutional bills—two of which the State, by not briefing a merits defense on appeal, concede are unconstitutional infringements of that constitutional guarantee. We simply note that one of those three bills, SB 319, has already been found by this Court to also

47

violate other constitutional interests, namely "to restrict legislative enactments to those made known to lawmakers and the public, to prevent legislators and the people from being misled, and to guard against obfuscation by the Legislature[.]" *Forward Mont.*, ¶ 35.  We found the vindication of these interests in that case was "sufficiently weighty to justify fees." *Forward Mont.*, ¶ 35.[17]  Successfully vindicating the constitutional independence of the Board of Regents from a flood of legislation which set out to destroy that independence is no less weighty an interest than those found in *Forward Mont.*, and, in any event, our caselaw does not require us to assess the strength or societal importance of a constitutional interest and decide whether that interest is as important as other constitutional interests.  There can be no serious contention these plaintiffs did not

---

[17] The Attorney General settled an attorney fee issue, and the State paid $825,000 in fees, in a recent case that may have shown similar equitable considerations as *Forward Mont.* (although the basis for fees in the case was under 42 U.S.C. § 1988(b) rather than the private attorney general doctrine).  In *Portland GE v. Nw. Corp.*, No. CV-21-47, 2023 U.S. Dist. LEXIS 100188 (D. Mont. June 8, 2023), the district court dismissed the attorney fee issue after the Attorney General settled with plaintiffs. *See* SET0001056, April 17, 2023 (available at https://montana.servicenowservices.com/citizen?id=settlements).  That case involved two Bills (SB 265 and SB 266) passed by the 2021 Legislature that were found clearly unconstitutional under multiple provisions of the United States and Montana Constitutions. *See Portland GE*, No. CV-21-47, 2022 U.S. Dist. LEXIS 177849 (D. Mont. Sept. 28, 2022); *Portland GE*, No. CV 21-47, 2022 U.S. Dist. LEXIS 191119 (D. Mont. Oct. 18, 2022) (adopting magistrate's findings and recommendations in full).  Specifically, SB 265 was found unconstitutional as applied under the Contracts Clause of the United States and Montana Constitutions, and SB 266 was found unconstitutional under the Commerce and Contracts Clauses of the United States Constitution— partly due to the Bills' explicit discriminatory purposes. *Portland GE*, No. CV-21-47, 2022 U.S. Dist. LEXIS 177849, *7–*8, *85–*88, *92 (D. Mont. Sept. 28, 2022); *Portland GE*, No. CV 21-47, 2022 U.S. Dist. LEXIS 191119 (D. Mont. Oct. 18, 2022) (adopting magistrate's findings and recommendations in full).  I make no comment on whether the three *Montrust* factors would have been satisfied in that case but only note the similarity of the equitable factors present in that case, here, and in *Forward Mont.*

successfully bring public interest litigation which vindicated important constitutional interests.

¶69 Here, we do not assert attorney fees are proper because of the Attorney General's defense of the law, which primarily involved repeated challenges to Plaintiffs' standing. Rather, attorney fees are proper because of the process through which the unconstitutional bills came to be: patently unconstitutional bills adopted through willful disregard of constitutional obligation. *See Forward Mont.*, ¶ 20. "If the [Private AG] Doctrine was eliminated where the Legislature has willfully disregarded its constitutional duties and purposefully passed unconstitutional laws, vindicating [] important constitutional rights through litigation would not be feasible." *Forward Mont.*, ¶ 24. Assessing fees when plaintiffs successfully challenge legislation which came about through such unconstitutional means may serve to deter wrongdoing in the first place. Chief Justice McGrath's Concurrence asserts "the evidence is not clear that the Legislature 'willfully disregarded its duties,'" regarding Article X, § 9, in the same manner it did regarding Article V, § 11, in *Forward Mont.*, because *Bd. of Regents* had not been issued at the time the challenged bills were passed. McGrath Concurrence, ¶ 75. This Court issued *Bd. of Regents* on June 29, 2022. In the present case, the State filed its motion for summary judgment on July 1, 2022, after *Bd. of Regents* was decided, and defended each of the three bills on their merits even though, as the Chief Justice notes, the Board's authority is clear after our holding in *Bd. of Regents*. The State thereafter filed a reply brief, again defending the bills on their merits in the face of our holding in *Bd. of Regents*, on August 22, 2022. And on appeal, the State, though incorrect on this point, asserts it "does not concede that

49

HB 349 and SB 319 are unconstitutional." And as is readily apparent from the discussion of Issue Two, above, the State still attempts to defend HB 112 on its merits even though, as the Chief Justice notes, such a merits defense is foreclosed by *Bd. of Regents*. Though the Chief Justice contends the "Attorney General's defense of the law [was not] in bad faith," McGrath Concurrence, ¶ 76, by the Chief Justice's own logic, it seems apparent the State's repeated attempts to defend the challenged bills on their merits—expending the time and money of the Plaintiffs in this case—after our holding in *Bd. of Regents* would be evidence of the State acting in bad faith. In this case, the Plaintiffs have "successfully litigated issues of importance to all Montanans and incurred significant legal costs." *Montrust*, ¶ 69. Forcing the Plaintiffs to bear the brunt of the significant legal costs incurred to vindicate the Montana Constitution's guarantee of an independent Board of Regents and an MUS free from legislative micromanaging would be a "substantial injustice." *Montrust*, ¶ 69 (quoting *Porter v. Porter*, 155 Mont. 451, 457, 473 P.2d 538, 541 (1970)). As such, we would conclude the District Court's denial of private AG doctrine fees was inappropriate and fees should have been awarded to Plaintiffs.

Justice Gustafson, joined by Justice McKinnon, disagreeing with the District Court Judgment as to attorney fees

/S/ INGRID GUSTAFSON
/S/ LAURIE McKINNON

Chief Justice Mike McGrath, joined by Justice Baker, concurring with the Opinion as to Issues One and Two and agreeing with the District Court decision as to Issue Three, attorney fees.

¶70 On the cross-appeal, I would affirm the District Court for two reasons: (1) the equities present in *Forward Montana*, which weighed in favor of awarding attorney fees, are not present here, and (2) the District Court did not abuse its discretion in finding under the second *Montrust* factor that "it may not have been necessary for Plaintiffs to initiate this action as the Board could have asserted its own authority."

¶71 Further, I note that other equitable considerations can be relevant beyond the three *Montrust* factors, such as bad faith, that may be used as a guidepost in determining fee awards. *Forward Mont.*, ¶ 25. In *Forward Montana*, the predicate for our award of attorney fees—in addition to the plaintiffs' showing under the three *Montrust* factors—was "the bad faith of the Legislature in enacting unconstitutional laws." *Forward Mont.*, ¶ 30.[1]

¶72 Generally, we use caution in awarding fees against the State under the private AG doctrine so as not to improperly interfere with the separation of powers. *Forward Mont.*,

---

[1] Justice Gustafson argues that because SB 319, §§ 2 and 21, were other amendments loaded onto SB 319 during the same free conference committee that we held justified fees in *Forward Montana*, fees should at least be justified for Plaintiffs' challenge of SB 319, §§ 2 and 21, here. Opinion, ¶ 68. However, Plaintiffs here challenged this section under Article X, Section 9(2)(a), of the Montana Constitution. They did not raise any claims under Article V, Sections 11(1) and (3), as the plaintiffs in *Forward Montana* did. The point of the private AG doctrine is to reward attorneys who bring successful public interest litigation that vindicate constitutional interests. *Serrano*, 569 P.2d at 1313–14. We cannot award fees to Plaintiffs here based on vindication of Article V, Section 11, interests, when they did not raise or vindicate any claims under Article V, Section 11. Under the claims Plaintiffs did raise, I would hold the proceedings and policies vindicated do not present the same equitable considerations that were present in *Forward Montana* as discussed further below.

51

¶¶ 19, 25, 30; *W. Tradition P'ship*, ¶¶ 16–17. In *Western Tradition Partnership*, where the only predicate for attorney fees besides the three *Montrust* factors was the Attorney General's defense of a law that we determined to be constitutional, the Attorney General's defense of the law did not overcome our caution in awarding fees against the State even though the United States Supreme Court disagreed with our opinion on the merits. *W. Tradition P'ship*, ¶ 20; *Am. Tradition P'ship, Inc. v. Bullock*, 567 U.S. 516, 132 S. Ct. 2490 (2012).[2]

¶73    It is not uncommon for courts to reference other equitable considerations that could support the award of fees against the State—whether that be the bad faith of the Attorney General in defending the law, the bad faith of the Legislature in enacting the law, the State's breach of fiduciary duties, or some other. *See, e.g.*, *Montrust*, ¶¶ 51, 58; *W. Tradition P'ship*, ¶ 20; *Forward Mont.*, ¶ 30; *compare Burns*, ¶ 24 (awarding fees based on a strong showing under the three *Montrust* factors alone). The District Court's reference to § 25-10-711, MCA, regarding the award of costs and reasonable attorney fees is a good example.[3]

---

[2] Although *Western Tradition Partnership* clearly made a strong showing under the three *Montrust* factors, which may have supported an award of fees on its own, there were other equitable factors in that case that precluded fees—namely, "equally significant" interests and unique Montana constitutional principles in defense of the law. *W. Tradition P'ship*, ¶ 20.

[3] While the private AG doctrine is not dependent on § 25-10-711, MCA, for an award of fees, it can provide a guidepost to courts in ordering such awards. *See Forward Mont.*, ¶ 30. As *Serrano* discusses, "[t]he 'private attorney general' theory must be accepted or rejected on its own merits— i.e., as a theory rewarding the effectuation of significant policy." *Serrano*, 569 P.2d at 1314 n.16.

¶74 Here, there was no showing of the same equitable factors that led to our decision in *Forward Montana*. The only instance of possible Legislative bad faith that Justice Gustafson notes is that Legislative Services put the Legislature on notice that HB 112 and HB 349 may violate Article X, Section 9, of the Montana Constitution and that the Legislature made no effort to address these concerns. Opinion, ¶ 68. But the legal review note that Legislative Services attached to these Bills cited only to *Bd. of Regents v. Judge*, 168 Mont. 433, 543 P.2d 1323 (1975), and noted that, because of *Judge*, the Bills "may raise potential questions about whether this bill conforms with Article X, section (9)(2)(a), of the Montana Constitution."

¶75 *Judge* did not put the Legislature on clear notice that the laws at issue here were unconstitutional such that we can say the Legislature was acting in bad faith in enacting them. In *Judge*, we examined the legislative appropriations power in relation to the authority granted to the Board of Regents. We held that the Legislature clearly had the power to appropriate funds to the Montana University System through public operating funds of the State, and to itemize expenditure of these appropriations. *Judge*, 168 Mont. at 446, 449–50, 543 P.2d at 1331–33. Nevertheless, we held that the Legislature could not do indirectly through its appropriations what it would be impermissible to do directly. *Judge*, 168 Mont. at 450, 543 P.2d at 1333. At the time these Bills were passed, the decision in *Board of Regents* had not been issued and of course not referenced by the legislative staff. Here, the evidence is not clear that the Legislature "willfully disregarded its constitutional duties" with regards to Article X, Section 9, of the Montana Constitution

in this case as it did with Article V, Section 11, in *Forward Montana*. Opinion, ¶ 69; s*ee Forward Mont.*, ¶ 24.

¶76   Nor was the Attorney General's defense of the law in bad faith. The Attorney General focused most of its appellate arguments on Plaintiffs' standing, a threshold jurisdictional requirement. This argument was clearly not outside the bounds of legitimate argument as it convinced two members of the Court. *Cf. W. Tradition P'ship*, ¶ 20.

¶77   We also noted in *Forward Montana* that there are situations where fees may be awarded against the State where there is no bad faith found to effectuate the purposes of the private AG doctrine—but this is not that case. *Forward Mont.*, ¶ 30. For such a case, Plaintiffs would have to make a strong presentation of evidence under the three *Montrust* factors alone or discuss other equitable factors that support an award of fees. *See, e.g.*, *Burns*, ¶ 24 (awarding attorney fees against county based on the three factors alone). The District Court did not abuse its discretion in finding that equitable considerations did not weigh in favor of attorney fees.

¶78   In addition, I would hold that the District Court appropriately determined there was not an adequate showing under the second *Montrust* factor to support an award of attorney fees against the State.[4]   Even when the plaintiff vindicates important constitutional interests, "we still look at the necessity for private enforcement." *Forward Mont.*, ¶ 36.

---

[4] I do not discuss the first or the third *Montrust* factors here. I agree with the District Court that these factors are met and with Justice Gustafson that "[t]here can be no serious contention these plaintiffs did not successfully bring public interest litigation which vindicated important constitutional interests" under the first *Montrust* factor. Opinion, ¶ 68. My concern is with the second *Montrust* factor and other equitable considerations that Montana courts generally look to

¶79 As noted by the District Court, there was an independent entity of State government here who could have enforced its constitutional authority—the Board of Regents. The Board is often willing and able to defend its constitutional authority. *See, e.g., Bd. of Regents*, ¶ 6. Plaintiffs here did not make the necessary showing that the Board was unwilling or unable, for whatever reason, to challenge these laws besides a conclusory argument that Plaintiffs' lawsuit was necessary because the Board had not yet brought an action. Other than simply observing that the Board of Regents never got involved in this case, Justice Gustafson's resolution of the second *Montrust* factor fails to examine the record and provides no authority or analysis to inform its decision. A party is not relieved from its burden of showing why private enforcement was necessary by merely filing suit first.

¶80 Plaintiffs filed suit a month before HB 112 and SB 349 were set to go into effect. Justice Gustafson reasons that because the Board did not intervene or take any other legal action in the year and a half between filing and summary judgment, private enforcement was necessary. Opinion, ¶ 61. But that is mere speculation. We could just as easily speculate that the Board was preparing to challenge the laws when Plaintiffs filed their lawsuit;[5] that the Board decided to watch the lawsuit closely—prepared to intervene or join

---

in addition to the three *Montrust* factors that were not presented here. *Accord Serrano*, 569 P.2d at 1314 (suggesting three *basic* factors courts consider in awarding fees under the private AG doctrine, but in no means precluding other considerations such as those we often look to as discussed above).

[5] For example, the Board of Regents filed suit against HB 102 just four days before a main provision of the Bill was set to go into effect. *Bd. of Regents*, ¶¶ 5–6.

the case as necessary at any point to protect its authority—but decided not to interfere if Plaintiffs were doing everything the Board would have done, either to save money, to save itself from political reprisal, or for whatever other reason; and that the Board decided that "[public] enforcement was [not] necessary" due to Plaintiffs' quick filing and litigation skills.

¶81 The Board has shown that it is willing to defend its constitutional authority. It was not an abuse of discretion for the District Court to find that "it may not have been necessary for Plaintiffs to initiate this action as the Board could have asserted its own authority," when Plaintiffs' only argument under this factor was that the Attorney General defended the laws and the Board had not yet sued. The Board may have filed suit if it had been given the chance, but we do not know because Plaintiffs filed their lawsuit first. Justice Gustafson's reasoning here would allow attorney fees even though Plaintiffs made no showing that their private lawsuit was *necessary* to vindicate important public policy. *See Forward Mont.*, ¶ 15.

¶82 While it is "salient" that the State provided no analysis on a factor, thus conceding it, *see Clark*, ¶ 14; Opinion, ¶ 61, it does not relieve Plaintiffs of their initial burden to show that the second *Montrust* factor is met or their burden on appeal of showing that the District Court abused its discretion in finding that it was not met. *Forward Mont.*, ¶ 15. Importantly here, Plaintiffs presented no evidence that this lawsuit was—for whatever reason—necessary for purposes of the award of fees under the private AG doctrine and thus did not overcome their initial burden before the District Court.

¶83    "Necessity" is a strong word and demands more than the speculation offered here. When the Attorney General is the only public agency involved in a constitutional challenge, this consideration easily may be satisfied. But when there is an independent public enforcement entity, especially one that has shown its willingness to protect the public interest, more is required. We do not overturn a trial court's discretionary ruling absent a showing that the court acted arbitrarily or without conscientious judgment. *In re Est. of Burns*, 2023 MT 253, ¶ 9, 414 Mont. 365, 540 P.3d 1029. Without any evidence to substantiate a finding that the Board declined to bring action or even had a chance to consider it, Plaintiffs have not met their burden on appeal to demonstrate an abuse of discretion by the District Court.

¶84    I would affirm the District Court on not awarding attorney fees. The equities do not favor awarding attorney fees, nor have Cross-Appellants demonstrated sufficient necessity under the second prong of the *Montrust* factors to support finding an abuse of discretion.

¶85    The lack of a majority on Issue Three necessitates that the District Court order stand.

/S/ MIKE McGRATH

Justice Beth Baker joins in the Opinion of Chief Justice McGrath.

/S/ BETH BAKER

Justice James Jeremiah Shea, concurring with the Opinion as to Issues 1 and 2, and affirming the District Court's decision as to Issue 3, attorney fees:

¶86    I concur with the majority Opinion on Issues One and Two.  As to Issue Three, although I do not fully concur with Chief Justice McGrath's analysis, under the specific facts of this case I agree with his assessment that the District Court did not abuse its discretion by determining that the second *Montrust* factor was not satisfied because "it may not have been necessary for Plaintiffs to initiate this action as the Board could have asserted its own authority."  McGrath Opinion. ¶ 70.

/S/ JAMES JEREMIAH SHEA

Justice Jim Rice, dissenting.

¶87    The Court holds members of the university community are "proper parties" to this lawsuit and therefore entitled to vindicate the Board of Regents' authority, even when the Board itself has not decided to do so.  Opinion, ¶ 39.  The Court arrives at this conclusion by reasoning that, as members of the university community, the Plaintiffs have a sufficient interest in preventing any alleged infringement of the authority of the Board, here by the Legislature, to maintain this litigation.  I disagree with these conclusions and therefore dissent.

¶88    While standing to bring a claim is a threshold jurisdictional requirement, the inquiry here is unique, because the basis of the claim itself is a constitutional creation.  In contrast to general litigation, this matter arises from the particulars of Article X, § 9(2)(a), of the Montana Constitution, which states:

> The government and control of the Montana university system is vested in a
> board of regents of higher education which shall have full power,

58

responsibility, and authority to supervise, coordinate, manage, and control the Montana university system and shall supervise and coordinate other public educational institutions assigned by law.

¶89 This provision provides that "full power, responsibility, and authority" to "supervise, coordinate, manage, and control" the university system "is vested" in the Board of Regents. The power and clarity of the plain language of this provision should not be overlooked; it addresses and vests only the Board with full authority to control the university system, and no one else. Indeed, no one else—students, faculty, school presidents and administrators, staff, contractors, or any other person—is even mentioned by the provision. It exclusively addresses the Board of Regents and exclusively grants the "full" authority to this singularly referenced entity—the Board—to exclusively govern educational institutions. In contrast to the text, the Court holds that this "full power" may be exercised by anyone in "all parts" of the broad and amorphous "university community" by initiating a lawsuit in the Board's place, and with its powers.

¶90 The constitutional history of Article X, § 9(2)(a) explains the origins and purpose of this unequivocal text.[1] Prior to adoption of the 1972 Constitutional Convention, authority over higher education in Montana resided with the Legislature, who maintained "general control and supervision of the State University . . . [with] powers and duties [as]

---

[1] "The intent of the Framers controls our interpretation of a constitutional provision." *Bd. of Regents of Higher Educ. of Mont. v. State*, 2022 MT 128, ¶ 11, 409 Mont. 96, 512 P.3d 748 (citing *Butte-Silver Bow Local Gov't v. State*, 235 Mont. 398, 768 P.3d 327 (1989)). While "intent must first be determined from the plain language of the words used," *Bryan v. Yellowstone Cnty. Elem. Sch. Dist. No. 2*, 2002 MT 264, ¶ 23, 312 Mont. 257, 60 P.3d 381, we also may consider the "circumstances under which the Framers drafted the Constitution, the nature of the subject matter they faced, and the objective they sought to achieve." *Nelson v. City of Billings*, 2018 MT 36, ¶ 14, 390 Mont. 290, 412 P.3d 1058.

prescribed and regulated by law." Mont. Const. of 1889, art. XI, § 11. However, the delegates to the 1972 Constitutional Convention effected a significant governance change, following their debate about whether authority over the higher education system should remain with the Legislature or be vested with a separate and autonomous board of regents:

> Now, the basic question before us is still the same one that always has been, and that is, are we going to give to the board of regents the ability to manage the university system? Are we going to make them a real board of regents, with the power and the independence of the Legislature and of the Executive . . . .

Montana Constitutional Convention, Verbatim Transcript, March 13, 1972, Vol. VI, p. 2127. At the heart of this debate was the proposal to make the Board a "body corporate" with autonomy and self-regulating authority:

> [The proposed provision] generally grants right to the body to govern its own internal operations, and that should be emphasized. *That is what the keys to all of this is about, the power to govern its own internal operations, according to the articles of charter or incorporation—in other words, the grant of power*.

Montana Constitutional Convention, Verbatim Transcript, March 11, 1972, Vol. VI, p. 2053 (emphasis added). This view—that "the power to govern its own internal operations" should rest with the Board—prevailed at the Convention, resulting in approval of Article X, § 9(2)(a) to give the Board "full power" to autonomously manage the affairs of the MUS. This Court has since recognized and upheld the Board's independent rulemaking authority. *See Sheehy v. Comm'r of Political Practices for Mont.*, 2020 Mont. 37, ¶¶ 29-31, 399 Mont. 26, 458 P.3d 309 (holding that the Commissioner of Political Practices did not have jurisdiction to enforce the Ethics Code over independent rulemaking

60

bodies like the Board); *Bd. of Regents v. Judge*, 168 Mont. 433, 454, 543 P.3d 1323, 1335 (1975) (rejecting a condition restricting salary increases for MUS presidents because it would "den[y] the Regents the power to function effectively by setting its own personnel policies and determining its own priorities.").

¶91 Our recent decision in *Board of Regents of Higher Education of Montana v. State* is likewise consistent. There, the Board brought a challenge to HB 102, which could have interfered with the Board's ability to regulate concealed and open carry of firearms on MUS campuses, about which the Board had previously adopted policies. *Bd. of Regents*, ¶¶ 4-5. This Court struck down HB 102 as unconstitutional, reasoning the provision would "give the Legislature control and supervision over MUS campuses and *render the Board ministerial officers* with no true authority other than to effectuate the Legislature's will." *Bd. of Regents*, ¶ 19 (emphasis added). This was because "[s]uch application directly contradicts the constitutionally granted powers of the Board and undermines the Board's ability to govern the MUS . . . ." *Bd. of Regents*, ¶ 19. Our holding upheld the critical need for the Board to exercise its expertise and authority within the sphere of its specialized governance, as recognized by the 1972 Convention:

> Higher education is not simply another state service. The administrative structure of higher education cannot be considered an ordinary state agency. The unique character of the college and university stands apart from the business and usual [sic] of the state.

Montana Constitutional Convention, Verbatim Transcript, March 11, 1972, Vol. VI, p. 2053. The objective of the Constitutional Convention was to create an autonomous governing body that could "make long-range plans which are appropriate to the needs of

61

higher education and free from short-term political whims." Montana Constitutional Convention, Verbatim Transcript, March 11, 1972, Vol. VI, p. 2055.

¶92 However, in the Court's view, the Board is just one of many intended beneficiaries of Article X, § 9. I disagree, and draw from the plain language that, more than merely an intended beneficiary, the Board is the entire subject of the provision, and its autonomous role is the purpose of the provision. From there, the Court reasons that "[w]hile the Board of Regents would also have standing to challenge the legislation, that does not mean the Board is the only proper party who may challenge the legislation . . . ." Opinion, ¶ 39. The Court thus concludes the Plaintiffs have standing as members of the university community to enforce the Board's powers by challenging the Legislature's adoption of HB 349, HB 112, and SB 319. As we have explained, standing depends on "whether the constitutional or statutory provision . . . can be understood as granting persons in the plaintiff's position a right to judicial relief." *Schoof v. Nesbit*, 2014 MT 6, ¶ 21, 373 Mont. 226, 316 P.3d 831 (quoting *Warth v. Seldin*, 422 U.S. 490, 95 S. Ct. 2197 (1975)). Nothing within the text of Article X, § 9(2)(a) or within the constitutional history provides any support whatsoever for the proposition that members of the expanded and amorphous "university community" are intended to have any right to act on behalf of the Board, or to exercise its full authority, including by maintaining a lawsuit on behalf of the Board. In my view, the text of Article X, § 9(2)(a) and the constitutional history leads to the exactly opposite conclusion—that it is obvious such standing does not exist. Of course, the Plaintiffs are free to pursue their

62

own individual claims regarding any unlawful impact HB 349, HB 112, or SB 319 has had upon them. However, they are not entitled to act as the Board of Regents.

¶93 In my view, the Court also misunderstands the nature of Article X, § 9(2)(a). This provision is not about the Board's relationship with members of the university community, but rather about the Board's authority within the State's governmental structure to govern the university system autonomously—without interference from others. While members of the university community may be affected by Board decisions, including when the Board would decide to litigate or not, they have no standing to step into the Board's shoes and exercise the Board's "full power" on their own behalf. It could be said that the power to litigate is the power to control, or even to destroy. Decisions about when to litigate or when to tolerate, when to settle or when to pursue further relief, what trial strategy to employ, when to confess judgment and when to accept another's confession, and more, all can lead to case resolutions that create binding precedents which shape and define the parameters of the Board's authority. Such decisions are inherent to the "full power, responsibility, and authority to supervise, coordinate, manage, and control the Montana university system," and necessarily should be made exclusively by the Board itself, not by an amorphous group of surrogates.

¶94 In its briefing in the 2022 *Board of Regents* case, the Board repeatedly described the authority granted to it by Article X, § 9(2)(a), as "exclusive."[2] The Board there explained how that exclusive authority must work: "[o]nly *one party* can have 'full power'— otherwise, the power would not be 'full.' With respect to the supervision, coordination, management, and control of the MUS, the Constitution vests that 'full power' with the Board." Board of Regents Resp. Br., 21-0605, p. 31, filed Mar. 14, 2022 (emphasis added). The "one party" who is empowered to exclusively act with regard to the university system is the Board, not the Plaintiffs. The Court's holding today opens Montana's courtrooms to whoever in the broad and amorphous "university community" would desire to utilize the Board's exclusive and extensive authority, as if they were the Board, and pursue their own purposes, thus disbursing the Board's exclusive authority to others. This could result in the Board being subjected to and bound by rulings in cases it did not bring and by case settlements it did not agree to—whether or not they align with the Board's specific expertise to provide for the university system's mission and interests as a whole—and thus potentially "render the Board ministerial officers" with regard to those matters. *Bd. of Regents*, ¶ 19. In my view, this is an improper departure from the plain language of Article X, § 9(2)(a) and the constitutional history underlying that provision.

---

[2] *See* Board of Regents' Resp. Br., 21-0605, p. 1, filed Mar. 14, 2022 ("The Board possesses the *exclusive authority* to ensure the health and stability of the MUS.") (emphasis added); Board of Regents Resp. Br., 21-0605, p. 29 ("Montana public policy establishes that the Board has 'full' and *exclusive* power to control MUS.") (emphasis added) (capitalization omitted).

¶95 In response, the Court contends the Plaintiffs *have* pursued individual claims "[i]n this very case." Opinion, ¶ 38. However, I am referring to either constitutionally-based or statutorily-based claims Plaintiffs could bring for direct violations of rights in their individual capacities, not claims premised upon violation of the Board's constitutional authority.

¶96 The Court also cites *Missoula City-County Air Pollution Control Board v. Board of Environmental Review*, 282 Mont. 255, 937 P.2d 463 (1997), in support of the proposition that Plaintiffs can properly bring this suit under the Board's authority, but that case provides no authority for the claims brought here. In *Air Pollution Control Board*, the local air pollution board filed a MAPA-governed petition for judicial review of a decision made by the State Board of Environmental Review. 282 Mont. at 258, 263, 937 P.2d at 465, 468 (local board's petition "was brought pursuant to Title 2, Chapter 4, part 7, MCA, 'Judicial Review of Contested Cases.'"). In filing the petition, the local board claimed, pursuant to MAPA, the status of a "'person' aggrieved by the State Board's" order. *Air Pollution Control Board*, 282 Mont. at 258, 937 P.2d at 465. Citing the purpose of local boards as provided by statute, we held the local board satisfied MAPA's definition of an aggrieved "person" as that term was defined in § 2-4-102(8), MCA. *Air Pollution Control Board*, 282 Mont. at 262, 937 P.2d at 467-68. Thus, we concluded the local board had standing and could participate to challenge the administrative decision as an aggrieved person under MAPA, just like an individual aggrieved by the State Board's decision could. *Air Pollution Control Board*, 282 Mont. at 262, 937 P.2d at 467-68.

¶97 Clearly, satisfying the statutory qualifications for participation as an "aggrieved person" in a MAPA proceeding provides no authority to confer standing under the specific constitutional provision at issue here. The Board of Regents' authority is uniquely sourced and exclusively prescribed in the Constitution: "[t]he government and control of the Montana university system is vested in a board of regents of higher education *which shall have full power, responsibility, and authority to supervise, coordinate, manage, and control the Montana university system*." Mont. Const. art. X, § 9(2)(a) (emphasis added). The decision to create a specialized board itself "recognizes the expertise that those appointed to positions on the board provide." *Weems v. State*, 2023 MT 82, ¶ 40, 412 Mont. 132, 529 P.3d 798. This principle accords with the constitutional history in this case because, as noted above, the Constitutional Convention specifically recognized "[t]he unique character of the college and university" and the need for the Board of Regents' specialized authority. Montana Constitutional Convention, Verbatim Transcript, March 11, 1972, Vol. VI, p. 2053. The Plaintiffs cannot point to any intention, either within the text of Article X, § 9, or within the constitutional history leading to its adoption, to serve as a vehicle for vindicating individual interests. None exists, and therefore we should not insert those interests within that provision.

¶98 I would hold the Plaintiffs lack threshold standing under Article X, § 9(2)(a) to bring an action in the exercise of the Board's exclusive authority, reverse the District Court, and order dismissal of the action.

/S/ JIM RICE

Justice Dirk Sandefur joins in the dissenting Opinion of Justice Rice.

/S/ DIRK M. SANDEFUR

Justice Dirk Sandefur, dissenting in part.

¶99 I first and foremost concur with Justice Rice that the Plaintiffs lacked jurisprudential standing to challenge the subject legislation as an infringement of the constitutional authority of the Montana Board of Regents. However, if such threshold standing exists as determined by the Majority, I further concur that the challenged legislation unconstitutionally infringes on the constitutional authority of the Montana Board of Regents for the reasons stated in the Majority Opinion.

/S/ DIRK M. SANDEFUR